Argued and submitted May 26, affirmed in part, reversed in part and remanded
December 22, 1982

# WALTER E. HELLER WESTERN, INC.,
*Appellant,*
*v.*
# BOHEMIA, INC.,
*Respondent.*

## (No. A8001-00375, CA A21716)

655 P2d 1073

Robert D. Newell, Portland, argued the cause for appellant. With him on the briefs was Black, Kendall, Tremaine, Boothe & Higgins, Portland.

Charles F. Adams, Stoel, Rives, Boley, Fraser and Wyse, Portland, argued the cause for respondent. On the brief were Stephen S. Walters and Joyce A. Harpole, Portland.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

BUTTLER, P. J.

**BUTTLER, P. J.**

Plaintiff brought this action for conversion and for breach of contract (wrongful payment to plaintiff's assignor) to recover damages it incurred when lumber in which it held a perfected security interest was "purchased" and later resold by defendant. Plaintiff appeals from a jury verdict for defendant on its conversion claim and from the amount of damages awarded and the denial of prejudgment interest on its contract claim.

Both plaintiff and defendant were creditors of Oregon Skyline Forest Products, Inc. (Oregon Skyline), which operated a lumber mill in Vancouver, Washington, where it remanufactured low-grade lumber into lumber of a higher grade. Plaintiff financed Oregon Skyline's operation and held perfected security interests in all of its inventory and accounts receivable. In April, 1979, defendant sold three carloads of low-grade lumber to Oregon Skyline and sent Oregon Skyline invoices for $13,039.92. The invoices indicated that the transaction was a sale and provided for a 2 percent discount if the bill were paid within ten days and that an 18 percent (annual) "service charge" would be charged after 30 days. Defendant did not retain a security interest in the lumber; it had no security interest in any of Oregon Skyline's assets. The bill was not paid, and defendant demanded payment several times.

On June 26, defendant's vice-president arrived by helicopter at Oregon Skyline's yard with a fleet of defendant's trucks standing by. With Oregon Skyline's consent, approximately six truckloads of remanufactured lumber from Oregon Skyline's inventory were taken away. Oregon Skyline's president designated which lumber defendant could take, some of which appeared to have been remanufactured from the economy-grade lumber that defendant had sold it in April. Part of the lumber taken belonged to another supplier and was later turned over to that supplier.

Oregon Skyline billed defendant for what it considered to be the full value of the lumber ($28,345.34). The invoice, dated June 26, provided for a 2 percent discount if payment were made within ten days. It stated that payment was to be made to plaintiff, "by whom this account is

owned," and that any objection to the bill, or its terms, was to be reported to plaintiff within ten days. The lumber had not been tallied accurately, however, and on July 27, defendant and Oregon Skyline agreed that the correct price was $21,946.47. That figure was then reduced by the 2 percent discount, defendant's expenses in picking-up the lumber and the amount that Oregon Skyline owed defendant for the original sale of low-grade lumber, resulting in a net balance of $6,405.65. The parties signed a letter that day providing that Oregon Skyline was accepting a check for $6,405.65 in full settlement of all its claims.

On June 26, Oregon Skyline was indebted to plaintiff for more than $150,000 and was in default under the security agreement covering its inventory securing that debt. On June 27, plaintiff contacted defendant to inquire as to the events of the preceding day and informed defendant that it held a security interest in the lumber that defendant had taken. Sometime within the ensuing 30 days, defendant sold the lumber. On August 6, defendant received a letter from plaintiff stating that the lumber was subject to plaintiff's perfected security interest and that an invoice for the lumber had been sent to defendant. It concluded:

> "I am aware you are claiming an offset against Oregon Skyline Forest Products for monies owed to Bohemia Inc. and, at this time, I would request you forward us a complete accounting for this offset and you [sic] check for the difference."

Defendant replied three days later that it was under no obligation to plaintiff and enclosed a copy of its July 27 letter agreement with Oregon Skyline. Plaintiff charged the invoice back to Oregon Skyline. In January, 1980, plaintiff wrote to defendant, demanding payment for the full value of the lumber.

When defendant did not pay, plaintiff commenced this action. In its first claim for relief, plaintiff sought recovery in conversion for the full value of the lumber. In its second claim, plaintiff alleged that it was the assignee of the June 26 invoice from Oregon Skyline to defendant and again sought the full amount of the invoice. As affirmative defenses to the conversion claim, defendant alleged that: (1)

it had purchased the lumber as a buyer in the ordinary course of business; (2) plaintiff had waived its security interest in the lumber; and (3) plaintiff had ratified the transaction. As an affirmative defense to the contract claim, defendant alleged that it was entitled to an offset for the amount owed to it by Oregon Skyline.

At trial, both defendant's vice-president and the president of Oregon Skyline testified that the economy-grade lumber had been sold to Oregon Skyline with the understanding that defendant would have the "option" to buy it back after it had been remanufactured. Defendant's vice-president testified:

> "* * * And we would have the option of buying it back because it upgrades the product. * * * [A]nd, because of their weakness in credit, which they have had in all their companies, we have always had that arrangement, as several other companies have, with them."

The case was submitted to the jury on four special interrogatories. The jury found that defendant was a buyer in the ordinary course of business, with the result that it took the lumber free of plaintiff's security interest; accordingly, there was no conversion. It also found that plaintiff was the assignee of Oregon Skyline's invoice to defendant.[1] By stipulation, the question of damages was submitted to the court for decision following the jury verdict. Judgment was entered for plaintiff on its second (contract) claim in the amount paid by defendant to Oregon Skyline under their July 27 settlement. Plaintiff accepted and cashed defendant's check for $6,405.65,[2] the full amount of the judgment.

## I

In its first assignment, plaintiff contends that the trial court erred in denying its motion for a directed verdict on its conversion claim on the ground that defendant was not, and on these facts could not be, as a matter of law, a

---

[1] The jury did not answer the other two interrogatories relating to whether plaintiff waived its right to enforce its security agreement, and whether plaintiff ratified the action of defendant. As the interrogatories were posed, it was not required to do so.

[2] Defendant's motion to dismiss this appeal on the ground that plaintiff had elected its remedy was denied without leave to renew.

buyer in the ordinary course of business of the lumber it acquired from Oregon Skyline's inventory.

Under Article 9 of the Uniform Commercial Code (UCC), ORS 79.1010-.5070, the general rule is that a perfected security interest continues in collateral, notwithstanding its sale by the debtor, ORS 79.3060(2), unless the sale is authorized by the security agreement; here it was not. ORS 79.3070(1), however, provides that a "buyer in ordinary course of business" takes free of a security interest created by the debtor. ORS 71.2010(9) provides, in relevant part:

"(9) 'Buyer in ordinary course of business' means a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind * * *. *'Buying'* may be for cash or by exchange of other property or on secured or unsecured credit and *includes receiving goods* or documents of title *under a preexisting contract for sale but does not include a transfer* in bulk or as security for or *in total or partial satisfaction of a money debt."* (Emphasis supplied.)

Although that provision imposes several requirements on one claiming to be a buyer in ordinary course of business, the critical issue here is whether the June 26 transaction between defendant and Oregon Skyline constituted "buying" within the meaning of that section.

■ The initial question is whether the transfer of the remanufactured lumber from Oregon Skyline to defendant was "in total or partial satisfaction of a money debt." It is clear that part of the transfer was in total satisfaction of Oregon Skyline's debt to defendant. In *Evans Products v. Jorgensen,* 245 Or 362, 421 P2d 978 (1966), the court held that the defendant, who had sold veneer to a manufacturer of plywood and who, after the buyer was unable to pay cash, had accepted payment by a transfer of plywood from the manufacturer's inventory on which plaintiff had a *security interest,* did not take the plywood free of that security interest. The transfer was in total satisfaction of a debt and, therefore, was not "buying" within the meaning of the UCC. Here, the lumber that defendant received was ultimately valued at $21,946.47, against which defendant

offset Oregon Skyline's debt to it of $13,039.92, its expenses and a 2 percent discount for a net payment of $6,405.65. As to the quantity of lumber valued at $13,039.92, the transfer was in total satisfaction of the debt owing to defendant and, under *Evans Products,* defendant would not have taken it free of plaintiff's security interest.

This case differs from *Evans Products,* however, in that new value was given in addition to satisfaction of the debt, and the parties disagree as to the significance of that fact. Both parties contend that the transaction cannot be "fractionalized" and that therefore the *entire* transaction should be treated, defendant contends, as a "buying" or, plaintiff contends, as a transfer in satisfaction of a money debt. Consideration of the underlying policies of Article 9 persuades us that both parties are mistaken on that point.

When it becomes necessary for a creditor to realize on the collateral of an insolvent debtor, a creditor with a perfected security interest, such as plaintiff, has priority over a general creditor, such as defendant. As between perfected security interests, the first one perfected generally has priority. ORS 79.3120(5)(a). One exception to that rule is that a "purchase money security interest," ORS 79.1070, if perfected, takes priority over the earlier perfected security interest in the same inventory. ORS 79.3120(3). Defendant could have taken a purchase money security interest in the lumber that it sold in April to Oregon Skyline, but it did not. In order to protect the holder of the prior security interest, perfection requires, among other things, notification to the holder of that interest. ORS 79.3120(3)(b). The official comment states:

> "* * * The reason for the additional requirement of notification is that typically the arrangement between an inventory secured party and his debtor will require the secured party to make periodic advances against incoming inventory or periodic releases of old inventory as new inventory is received. A fraudulent debtor may apply to the secured party for advances even though he has already given a security interest in the inventory to another secured party. The notification requirement protects the inventory financer in such a situation: if he has received notification, he will presumably not make an advance; if he has not received notification (or if the other interest does

not qualify as a purchase money interest), any advance he may make will have priority."

To permit a general creditor to extinguish a perfected security interest by "purchasing" some of the debtor's inventory in return for cancelling the debt owed to it would eviscerate the priorities established by Article 9 and the safeguards accorded inventory financers with perfected security interests. That is why "buying" does not include transfers in satisfaction of a money debt. It follows that a general creditor should not be able to circumvent those safeguards merely by giving some measure of new value as well. To treat the entire transaction as though it were for new value, as defendant contends that we should, would invite general creditors, who discover that their debtor is in financial difficulty, to race to him and "purchase" inventory at slightly more than the amount owed. We see no principled distinction between paying $6 or $6,000 in new value.

Defendant recognizes that problem, but argues that sham transactions designed to deprive a creditor of its security may be challenged on factual grounds. That is, whether a general creditor is a buyer in the ordinary course should be determined the same way it is for other purchasers: by whether the purchaser acted in "good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party." That approach, however, presents problems. Foremost, it abandons a clear-cut rule in favor of litigation in an area where the bright line is readily discernible. To ignore that bright line, and to leave to a fact finder the determination of the ultimate rights of the holder of a perfected security interest in the inventory, would render that security interest less secure. To the extent that that occurs, the ability of a business to obtain inventory financing would be jeopardized rather than enhanced, contrary to an underlying purpose of the UCC. The other side of the coin is that an unsecured creditor who takes inventory in "total or partial satisfaction" of the debt knows that he is doing that and risks gaining nothing if the inventory is covered by a perfected security interest — a fact he can determine by checking the appropriate records. Making a cash purchase of

of additional inventory ought not to change the nature of the entire transaction.

■ ■ To say that the transaction was entered into in good faith misses the point. True, good faith is a prerequisite to a purchase being in the ordinary course of business, ORS 71.2010(9), but good faith does not convert a transfer in satisfaction of a money debt into a "buying" under that section. The reason it does not seems clear enough: to the extent that the inventory is exchanged for debt satisfaction, there are no proceeds to the debtor available to pay off the secured party, the availability of which the secured party has the right to rely on. A buyer in ordinary course takes free of the security interest, because the inventory financer contemplates that inventory will be sold in order to pay off his debt, but not to dilute his security. If it were the intent of the drafters of Article 9 that good faith determine whether a general creditor-buyer takes free of the security interest as to the *entire* transfer of inventory where *some* new value is given, presumably they would have provided that good faith control even if no new value be given.[3] *But see General Electric Credit Corp. v. R. A. Heintz Constr. Co.,* 302 F Supp 958 (D Or 1969).

Opposite considerations obtain with respect to that portion of the inventory that was received by defendant in return for new value, *i.e.,* loading expenses and cash. As to that part of the transaction, the secured party's position is no different from what it would be with respect to any other buyer in the ordinary course of business: the secured party's debt can be paid off by the proceeds. If the proceeds are dissipated, or otherwise unavailable, when the secured creditor attempts to realize on its security, including proceeds from inventory, that is the risk that an inventory financer assumes as to all inventory sales: it is contemplated that inventory will be sold in order that the debt

---

[3] Defendant also contends that it received the remanufactured lumber pursuant to a "pre-existing contract for sale" within the meaning of ORS 71.2010(9) and that the transaction was therefore a "buying" notwithstanding the satisfaction of the debt, because defendant and Oregon Skyline had an oral option contract whereby defendant could buy back the lumber it sold Oregon Skyline. We do not consider that arrangement as a preexisting contract for sale or that it changed the April transfer of low-grade lumber to Oregon Skyline from being a *sale*. At that time a money debt was created and owing from Oregon Skyline to defendant, and the lumber became part of the purchaser's inventory.

that it secures can be paid off. Moreover, fractionalizing the transaction grants the protection of ORS 79.3070 to good faith purchasers who pay virtually all of the price in cash but also forgive a minor debt.

The only case cited to us, or that we have found, on the question of "fractionalizing" a transaction where part of the transfer of inventory was in satisfaction of a debt is *General Electric Credit Corp. v. R. A. Heintz Constr. Co., supra.* In that case, the United States District Court for the District of Oregon held that such a transaction must be considered as a whole and not "fractionalized" into qualifying and non-qualifying parts. We are not persuaded by that court's analysis. First, the court relied on the fact that the "buyer in ordinary course" language in the UCC is the same language used in the Uniform Trust Receipts Act (UTRA), which was compiled before the UCC. Because two cases under UTRA had interpreted that language to include one who paid new value in addition to satisfying a debt, the same interpretation should be given the language in the UCC. The principal problem with that analysis is that the definitions of "buyer in the ordinary course" are substantially different in the UCC and UTRA.[4] We do not consider the analogy well taken.

The second point on which that court relied is that the section defining "buyer in ordinary course" (ORS 71.2010(9)) must be construed in light of the section dealing with the power of one entrusted with goods to transfer title. ORS 72.4030. By so doing, the court concluded that the compilers of the UCC

"* * * wanted to 'state a unified and simplified policy on good faith purchase of goods', and as to 'buyers in the ordinary course of business', to create *'a single principle* protecting persons who buy in ordinary course out of inventory.' It would be completely inconsistent with the

---

[4] The definition in UTRA, § 1, is:

" 'Buyer in the ordinary course of trade' means a person to whom goods are sold and delivered for *new value* and who acts in good faith and without actual knowledge of any limitation on the trustee's liberty of sale, including one who takes by conditional sale or under a pre-existing mercantile contract with the trustee to buy the goods delivered, or like goods, for cash or on credit. 'Buyer in the ordinary course of trade' does not include a pledgee, a mortgagee, a lienor, or a transferee in bulk." (Emphasis supplied.)

announced policy to penalize a purchaser who qualified as a 'buyer in the ordinary course of business', by 'fractionalizing' the entire transaction and making the sale part good and part bad. * * *" 302 F Supp at 964. (Emphasis in original.)

The point eludes us. ORS 72.4030(5) expressly provides that "the rights of other purchasers of goods and of lien creditors are governed by ORS 79.1010 to 79.5070 on secured transactions, * * *." That would seem to bring us back to square one. We decline to follow that decision.

■     Accordingly, we conclude that the transfer to defendant may be "fractionalized" between that part that qualifies as a "buying" in the ordinary course of business and that part which was not such a "buying" because it was a transfer in satisfaction of an existing debt. Because plaintiff's motion for a directed verdict on its conversion claim was premised on the theory that the transaction as a whole either qualified or not as being in the ordinary course, we cannot say that the trial court erred in denying it on the ground argued.

■     Plaintiff's other bases for its motion were that the defendant did not act in good faith and that the "sale" was not in the ordinary course of Oregon Skyline's business. There was evidence that, if believed, would permit a jury to find that defendant believed in good faith that it was permitted to purchase the lumber as it did, that it had no knowledge of plaintiff's security interest and that the so-called "option" arrangement was commonly used. The Court did not err in denying plaintiff's motion on those grounds either.

II

■     In its second assignment, plaintiff contends that the trial court erred in failing to award prejudgment interest, ORS 82.010, on its judgment for breach of contract. We agree.

Both parties agree that the controlling principle of law was established by *Public Market Co. v. Portland,* 171 Or 522, 130 P2d 624, 138 P2d 916 (1943), which held that interest is to be allowed where

"* * * 'the demand is of such a nature that its exact pecuniary amount was either *ascertained, or ascertainable*

by simple computation, or by reference to generally recognized standards such as market price', and where 'the time from which interest, if allowed, must run, — that is, a time of definite default or tort-feasance, — can be ascertained.' 1 Sedg. on Damages (9th Ed.) 571, § 300." 171 Or at 625.

Here the amount that defendant was obligated to pay plaintiff under the invoice was not only ascertainable, but defendant did, in fact, calculate that figure ($6,045.65) and pay Oregon Skyline that amount on July 27.

The amount is not made unascertainable because plaintiff claimed that the value of the lumber taken on June 26 was $28,345.34 in its August 6 letter demanding an accounting for the offset and a check for the difference in value. Plaintiff, at that time, presumably relied on the inaccurate June 26 invoice sent by Oregon Skyline. Plaintiff's August 6 letter demanded only the difference in value; on July 27, that difference had been determined, but plaintiff had not been informed by August 6. After defendant refused to pay, plaintiff demanded payment for $28,345.34 in full. That demand, subsequent to defendant's refusal to pay, does not alter the fact that the amount owed to plaintiff under the invoice, which had been assigned to it, was whatever amount defendant owed Oregon Skyline. That amount was ascertainable and had been ascertained; it is the amount awarded plaintiff. Plaintiff is entitled to prejudgment interest from July 27, 1979.

### III

■ Lastly, plaintiff contends that, in determining the amount that defendant owed under the invoice, the court erred in allowing defendant the 2 percent discount for payment within ten days. We agree.

Oregon Skyline's June 26 invoice charged defendant $28,345.34 for the remanufactured lumber and provided that defendant would receive a 2 percent discount if it paid within ten days. It also advised defendant to pay that amount to plaintiff and that any objection to the bill must be reported to plaintiff within ten days after its receipt. As discussed above, the quantity of lumber was overstated, and, of course, defendant was not obligated to overpay plaintiff. After the correct amount was determined on July 27, however, defendant did not pay plaintiff at all.

Overlooking the requirement that defendant notify plaintiff of its objections to the bill, we will assume that the ten-day period within which to claim the 2 percent discount ran from July 27 and that the discount would be allowable if payment had been made to plaintiff.

Defendant contends that because Oregon Skyline allowed the discount as part of its July 27 settlement and, therefore, could not recover the extra 2 percent, plaintiff cannot recover it either, because, as assignee, its rights are no greater than those of its assignor. That argument misses the point. Defendant had notice of the assignment and paid the wrong party. It is not entitled to the discount.

Because the only error in the judgment involves a simple mathematical computation eliminating the 2 percent discount and adding interest from July 27, 1979, to the date the judgment is entered, there is no necessity for a new trial. We remand for a redetermination of the amount of the judgment.

Affirmed in part; reversed in part, and remanded.