Argued and submitted June 4, affirmed October 31, 1984, Erickson Hardwood Co.'s reconsideration and North Pacific Lumber's reconsideration denied January 11, both petitions for review denied February 20, 1985 (298 Or 705)

ERICKSON HARDWOOD CO.,
*Respondent - Cross-Appellant,*

*v.*

NORTH PACIFIC LUMBER CO.,
*Appellant - Cross-Respondent.*

(A8006-03357; CA A27765)

690 P2d 1071

Robert L. Allen, Portland, argued the cause for appellant - cross-respondent. With him on the briefs were G. Kenneth Shiroishi, and Morrison, Dunn, Carney, Allen & Tongue, Portland.

John L. Langslet, Portland, argued the cause for respondent - cross-appellant. With him on the briefs were

Joan Lisensky Volpert, and Martin, Bischoff, Templeton, Biggs & Ericsson, Portland.

Before Gillette, Presiding Judge, and Van Hoomissen and Young, Judges.

VAN HOOMISSEN, J.

## VAN HOOMISSEN, J.

This is an action for breach of contract. A jury returned a verdict in plaintiff's favor. Defendant appeals. It contends that the trial court erred in several of its evidentiary and procedural rulings. Plaintiff cross-appeals. It contends that the court erred in denying it prejudgment interest. We affirm.

Erickson Hardwood (Erickson) is a small mill that produces green alder lumber. North Pacific Lumber (Norpac) is a forest products wholesaler and broker. In 1968, Erickson and Norpac entered into a contract, drafted by Norpac, under which Erickson granted Norpac

> "the exclusive right to purchase from Erickson all lumber and forest products * * * which Erickson, or any subsidiary or associated company, shall during the life of this contract manufacture or produce."

Norpac agreed to set up facilities in Portland to market Erickson's lumber. Norpac also agreed that, if the parties could agree on price and cutting orders, it would endeavor to accept from Erickson a minimum of 200,000 board feet of lumber monthly.

The contract stated in relevant part:

> "[T]he parties shall endeavor from time to time to arrive at proper prices to be paid to Erickson for the different grades and qualities of lumber to be produced by Erickson, * * * and in the event that the parties cannot agree upon a proper price, then Erickson shall have the right to sell to parties other than Norpac provided that Erickson shall not sell to any third party at a price which is equal to or less than the price which Erickson has offered to sell to Norpac, and Erickson agrees that prior to sale of any forest products to any third party Erickson will first offer said product to Norpac at the price at which it proposes to sell to said third party, and Erickson shall pay to Norpac a commission equal to five percent (5%) upon all sales made by Erickson to third parties, except that in recognition of the previous association between Erickson and Chappel, Erickson may make sales of two (2) truck loads per month (approximately 20,000 feet) to Chappel without the payment of said commission provided that said sales are at the request of Chappel without any initiation of said sales by Erickson."

It also required Erickson to furnish Norpac with a monthly balance sheet and profit and loss statement and an annual financial statement including information about its assets and liabilities. Norpac had the right to examine Erickson's books and records. Norpac gave financial advice to Erickson, and Erickson paid for that advice.

With minor exceptions, Erickson's entire income came from Norpac. Throughout the contract's term, Erickson made enough money to maintain its operation, but it never made a profit. Because Erickson's product was unique, no prices were published for it, and Erickson did not know what it was worth. Norpac did not tell Erickson how much it had earned from sales of Erickson's lumber, and at times Norpac represented that it had earned nothing. Occasionally, Erickson heard rumors of good prices, but those rumors were discounted by Norpac as inaccurate. The evidence at trial indicated that Norpac had made profits of 30 percent or more on those sales.

In 1977, Erickson learned what Norpac was receiving for the lumber. It then terminated the contract and brought this action. In its pleadings, Erickson alleged that the contract created an exclusive sales agreement that established a fiduciary relationship between the parties; that Norpac had breached its fiduciary relationship by failing to disclose the true market condition and by actively misrepresenting that condition; and that Norpac had wrongfully earned excessive profits at Erickson's expense. The trial court found that the contract unambiguously established an agency relationship between the parties, giving rise to implied fiduciary obligations. Specifically, the court found that Norpac was serving as a fiduciary in setting a "proper price" and in marketing Erickson's lumber.

Norpac contends that the trial court erred in failing to dismiss Erickson's complaint on the ground that it was not timely filed. Erickson filed its action two and one-half years after its cause of action was discovered. Norpac argues that, because Erickson's action is based on fraud or deceit, it is governed by the two-year statute of limitations applicable to

tort actions, ORS 12.110(1), not the six-year statute applicable to contract actions, ORS 12.080(1).[1]

In determining whether an action arises in tort or in contract, we focus on what characteristic of the action predominates. In *Securities-Intermountain v. Sunset Fuel,* 289 Or 243, 259, 611 P2d 1158 (1980), the Supreme Court explained:

"'* * * If the alleged contract merely incorporates by reference or by implication a general standard of skill and care to which the defendant would be bound independent of the contract, and the alleged breach would also be a breach of this noncontractual duty, then ORS 12.110 applies. *Dowell v. Mossberg,* [226 Or 173, 355 P2d 624, 359 P2d 541 (1961)]. Conversely, the parties may have spelled out the performance expected by the plaintiff and promised by the defendant in terms that commit the defendant to this performance without reference to and irrespective of any general standard. Such a defendant would be liable on the contract whether he was negligent or not, and regardless of facts that might excuse him from tort liability. Or the nature either of the defendant's default or of the plaintiff's loss may be of a kind that would not give rise to liability apart from the terms of their agreement. In such cases, there is no reason why an action upon the contract may not be commenced for the six years allowed by ORS 12.080." (Footnote omitted.)

Norpac argues that this case fits under the first alternative, which is addressed to cases alleging violation of a general standard of care by implication. It relies on *Lindemeier v. Walker,* 272 Or 682, 538 P2d 1266 (1975), and *Bales for Food v. Poole,* 246 Or 253, 424 P2d 892 (1967); *see Dowell v. Mossberg,* 226 Or 173, 355 P2d 624, 359 P2d 541 (1961). *Lindemeier* was an action against a real estate broker for damages resulting from an intentional failure to obtain the best sales price for certain property. The parties had signed a standard real estate contract. The Supreme Court held that the action was for

---

[1] The trial court stated:

"Here the sole basis for being able to claim a fiduciary relationship * * * is the contract itself and the contract itself sets forth the legal basis upon which the duty arises, including the allegation in the contract that the parties will endeavor to arrive at a proper price and the Plaintiff is claiming a breach by the Defendant of its responsibility to attempt to arrive at a proper price and the fiduciary duty that is attendant with the obligation is contained within the agreement itself.

"So, in the Court's view the gist of this action is contract, not tort, and for that reason the six-year statute applies."

professional malpractice and that the tort statute of limitations was applicable. *Bales for Food* was an action against a professional engineer for damages resulting from the negligent mislocation of a building. The complaint alleged that the defendant had failed to exercise due care in planning and supervising construction. The Supreme Court held that the action sounded in tort, although the parties had signed a contract requiring the defendant to perform the usual duties of a professional engineer. Neither case relied on any specific provision of its respective contracts.

In *Securities-Intermountain,* 289 Or at 260, the Supreme Court acknowledged the difficulty inherent in characterizing an action for the purpose of applying the appropriate statute of limitations:

> "These variations may occasionally call for close decisions, but they are the product of a stautory scheme which, since 1870, has imposed different periods of limitations on commencing different actions defined by the legal basis of the claimed liability. Quoting the late Dean Prosser's observation that 'there has been a failure to think the thing through,' Justice O'Connell's opinion for the court in *Bales for Food* 'concluded that there is a need for change in the law relating to the limitation of actions, but ... that the change should come through legislation ....' 246 Or at 257. \* \* \*" (Footnote omitted.)

Distinguishing between tort and contract claims is essential in deciding whether an action was timely filed. However, we must not lose sight of our goal: to redress a legal wrong.[2] It

---

[2] In *Securities-Intermountain v. Sunset Fuel, supra,* 289 Or at 255 n 7, the Supreme Court quoted the following language from *Ashmun v. Nichols,* 92 Or 223, 234, 178 P 234, 180 P 510 (1919):

> "Perhaps under our Code systems, we should not attempt to place too much stress upon a somewhat arbitrary and ill-defined distinction between torts and contracts. It is a theory of the Code procedure that a party shall have full redress for all legal wrong, whether the wrong results from a breach of contract or from a breach of more general law. It is obvious that many times, and in many cases the injury will depend partly upon the contract and partly upon a tort or wrong. In an action against a carrier of passengers the right of the injured passenger depends entirely upon his contract to be carried safely, and he could not recover without such contract either expressed or implied, and yet superimposed upon the contract is the wrongful and negligent breach, causing an injury to his person, which was not directly contemplated by the contract, and for which the contract provides no measure of damages. To say that the passenger must separate the two, and depend wholly upon the negligent wrong, on the one hand, or the mere breach of contract alone on the other, would be to deprive him effectually of a complete remedy."

would be unjust to bar an action merely because it contained elements of both tort and contract. Norpac argues that its misconduct, if any, amounts to deceit, fraud or misrepresentation. However, the Supreme Court has held:

> "* * * ORS 12.110 certainly does not contemplate that a defendant can defeat an action for breach of his contract by asserting that, independent of the contract, his own conduct constituted a tort, whether negligence or, for instance, fraud." *Securities-Intermountain v. Sunset Fuel, supra,* 289 Or at 259.

In its complaint, Erickson alleged that:

> "[Norpac] breached its obligations as the exclusive sales agent of the partnership in one or more of the following particulars:
>
> "a. [Norpac] failed to pay the partnership a proper price.
>
> "* * * * *
>
> "d. [Norpac], through a series of acts entailing economic coercion, unfair advantage, dishonesty, deceit and misrepresentation, acted so as to pay the partnership less than a proper price for the partnership's lumber production, while representing to the partnership that [Norpac] was acting in the partnership's best interests."

Thus, the complaint alleged specific breaches of the contract. The contract stated that the parties would agree on "proper prices." By virtue of its fiduciary relationship, Norpac had a duty to deal fairly and honestly. *See* ORS 72.1030(1)(b); *Perkins v. Standard Oil Co.,* 235 Or 7, 16, 383 P2d 107, 383 P2d 1002 (1963). The crux of the case was whether Norpac had breached its fiduciary duty to Erickson. A specific provision in the contract forms the basis for the action, but the standard of care required of fiduciaries must also be applied in establishing a breach. Even though the claimed *breach* sounds in fraud or deceit, *i.e.,* in tort, we agree with the trial court that the *action* was in contract. It was timely filed. ORS 12.080.

Norpac contends that the trial court erred in characterizing the contract as establishing a sales agency.[3] Construc-

---

[3] The trial court stated:

"* * * I think that the agreement obviously contained the aspect of an outright sale. But, it also includes with it in the Court's view, certain fiduciary responsibilities on the defendant's part which are owed to the plaintiff, which must be

tion of contracts is a question of law for the court. *McCallum v. Gray,* 273 Or 617, 619, 542 P2d 1025 (1975). Insofar as it can be determined, the intent of the parties prevails. *See Van v. Fox,* 278 Or 439, 445, 564 P2d 695 (1977); *Miller v. Miller,* 276 Or 639, 647, 555 P2d 1246 (1976). We look to the language of the contract and to other relevant circumstances, including the course of conduct pursued by the parties in their performance of the contract, to determine intent. *See Bauman v. Bauman,* 245 Or 574, 577, 423 P2d 181 (1967); *Perkins v. Standard Oil Co., supra,* 235 Or at 15; *see also* ORS 42.220.

■■ Some provisions of the contract here point to the existence of an exclusive sales agency. First, its recitals provide that Erickson

> "is desirous of obtaining the services of Norpac, which maintains a sales organization for the sale of forest products,"

and that,

> "* * * because of competitive market conditions and because of the organization required for an effective sales company, Erickson recognizes that a long-range sales policy should be adopted to assure proper sale of its product and this can best be accomplished in the manner herein set forth."

Although the recitals in a contract do not govern its meaning, they are helpful in determining the parties' intent. *See Miller*

---

based on a principal/agent relationship. It seems obvious to the Court as to this aspect, because the defendant in paragraph 3 of the agreement sets the prices it agrees to pay, and in paragraph 4 it's provided that the parties shall endeavor from time to time to arrive at the proper price to be paid by the defendant Norpac. Those provisions, in the Court's view, combined with the other indicia of agency, such as contract, refers to services that are going to be performed by the defendant, and the recital of plaintiff's concern for a long-range market and recognition of the difficulty for plaintiff to establish its own sales staff, the fact that the defendant agrees to maintain wholesale trading facilities at its Portland headquarters, agrees to purchase a minimum quantity of plaintiff's lumber, if the price can be agreed upon, the right that the defendant retain a first refusal before the plaintiff can sell to anyone else, and that the defendant is entitled to a five percent commission to be paid by the plaintiff if the plaintiff does sell to someone else. There is also an allegation in the complaint itself. I'm not sure that this applies, but it appears that the plaintiff was required to assume the risk of claims, at least in practice, if not in the agreement, and was required to reimburse the defendant for any claims made. I assume that's under the provision that he'll sell marketable and merchantable timber. The provision that the defendant is given the exclusive right from plaintiff to purchase all of plaintiff's output. I think when you combine all of these things together, it's clear to the Court that at least on the matter of setting price and the matter of the duty to market the plaintiff's product, that an agency relationship exists and there is a fiduciary obligation. So, as to his first claim of relief, the Court finds that it states [a] claim."

*v. Miller, supra.* Second, the contract gave Norpac the exclusive right to buy virtually all of Erickson's lumber; *but see Heywood v. Doernbecher Mfg. Co.,* 48 Or 359, 364, 86 P 357, 87 P. 530 (1906), *overruled on other grounds, Will of Pittock,* 102 Or 159, 214, 199 P 633, 202 P 216 (1921) (exclusive right to purchase does not of itself establish agency relationship). Third, Erickson had to pay Norpac a five percent commission on sales to third parties.[4] Fourth, the contract provided that Norpac would pay "proper prices" for Erickson's lumber. That language, taken in context, indicates that Norpac would determine a fair price based on the market and would pay Erickson accordingly. Fifth, the contract shows that Erickson intended that Norpac would act as its sales agent. In fact, that was an important part of Norpac's business. Norpac did not purchase for its own use; it only purchased for resale. Unlike Erickson, Norpac was aware of the market. There was evidence at trial that Norpac played a dominant role in the green alder lumber market. Sixth, the contract required Erickson to disclose its financial condition to Norpac and to allow Norpac access to its books. That requirement indicates a relationship between the parties that was closer than that of a buyer and seller dealing at arm's length.

The performance of the contract also supports a conclusion that Norpac acted as a fiduciary. As a practical matter, Norpac tightly controlled Erickson's finances and was well aware of that fact.[5] It advised Erickson on every aspect of

---

[4] Erickson argues that the commission provision could only be valid if an exclusive sales agency existed; otherwise it would be unenforceable for lack of consideration. *See Harris v. McPherson,* 97 Conn 164, 115 A 723 (1922); *Firszt v. Wdoviak,* 104 Conn 744, 133 A 586 (1926); *Martin Realty Co. v. Fletcher,* 103 NJL 294, 136 A 498 (1927). We do not comment on the enforceability of such a provision where no exclusive sales agency exists.

[5] In an internal memorandum, Norpac's accountant reported to his superiors:

"There is a possibility that you might want to increase the revenue to Erickson in order to keep them going, because it is my personal opinion that this [is the] type of an operation in which they will work for almost nothing and devote the long hours they do to the business, that they will stay alive forever when they are really bankrupt to start * * *.

"I don't think we can let our guard down on them in any way—I think you will still have to maintain a tight control over the money you advance and make sure that they tend to business. By doing this, I think there will be some years that they will make money and get a little bit out of debt, and there will be other years that they will lose money like they have this year—but in the long run I think they will stay broke and keep operating for a good period of time."

its business, and Erickson paid Norpac for that advice. Norpac's accountant did not suggest that Erickson increase its price to Norpac. Rather, he suggested that Erickson trim its costs and work harder. Norpac encouraged Erickson to borrow money to buy timber. It failed, however, to pay Erickson enough to repay its loans. At times, Norpac threatened to foreclose on those loans. Its manager described Erickson as a "captive mill." He told traders that Norpac had a "financial hold" on Erickson and that Norpac could dictate prices. Norpac had more control over Erickson than it had over any other of its suppliers. It earned greater profits on the sale of Erickson's lumber than it earned on any other suppliers' lumber. Norpac received a 5 percent commission on sales of other suppliers' lumber; it earned up to 30 percent profit on sales of Erickson's lumber. Erickson was Norpac's only supplier with that type of contract.

It is unnecessary to characterize this contract as an exclusive agency contract or an arm's-length sales contract. Both aspects exist. That is not uncommon. Norpac conceded as much at trial. In *Cowley v. Anderson*, 159 F2d 1, 3 (10th Cir 1947), the court explained:

> "Contracts of this kind are quite common. Sometimes they have been referred to as creating the relation of principal and agent and sometimes that of seller and buyer. But is now well settled that such contracts create a dual relationship between the parties. In some aspects it is that of principal and agent and in some that of vendor and vendee. It is not altogether one to the exclusion of the other. Whatever the nomenclature, the parties are not ordinary principal and agent. Neither are they ordinary vendor and vendee, dealing at arm's length. The relationship gives rise to a duty of mutual trust, confidence, and loyalty in their dealings with each other respecting the subject matter of the contract. Each owes the other a full measure of integrity and fidelity. Smyth Sales v. Petroleum Heat & Power Co., [128 F2d 697 (3d Cir 1942)]. The law guards a relation of that kind with a jealous care and is quick to disapprove a breach of the duty arising out of it. The exaction of good faith of parties occupying the relation is not a technical or arbitrary rule. It rests upon the broad principle of sagacious public policy."

*See Marnon v. Vaughan Motor Co.*, 184 Or 103, 194 P2d 992 (1948). We conclude that the record supports the trial court's finding that the parties' contract unambiguously established

an agency relationship between them which gave rise to fiduciary obligations.

Norpac contends that an issue of fact existed concerning characterization of the contract as an exclusive sales agency or a buy-sell agreement and that the trial court erred in refusing to instruct the jury that it should decide that question. We have already upheld the trial court's ruling that, as a matter of law, the contract established an agency relationship. The court's rulings on jury instructions were consistent with that ruling and we find no error.

Norpac contends that the trial court erred in instructing the jury on damages. Erickson offered evidence that it was customary to determine the value of green alder lumber using a "residual" formula. That calculation involves taking the price Norpac received for the lumber, then subtracting Norpac's costs plus a 5 percent commission. Using that formula, damages equal the difference between what Erickson received from Norpac and what it would have received if Norpac had paid it a proper price. The jury was instructed:

> "In determining damages you shall award Plaintiff the amount of money that is equal to the difference between a proper price for the lumber sold by Erickson Lumber to North Pacific as you determine that to be, less the amount paid to Erickson Lumber by North Pacific."

Norpac argues that ORS 72.7230 controls.[6] That statute requires evidence of the market price at the time and place of a

---

[6] ORS 72.7230 provides:

"(1) If an action based on anticipatory repudiation comes to trial before the time for performance with respect to some or all of the goods, any damages based on market price shall be determined according to the price of such goods prevailing at the time when the aggrieved party learned of the repudiation.

"(2) If evidence of a price prevailing at the times or places described in ORS 72.1010 to 72.7250 is not readily available the price prevailing within any reasonable time before or after the time described or at any other place which in commercial judgment or under usage of trade would serve as a reasonable substitute for the one described may be used, making any proper allowance for the cost of transporting the goods to or from such other place.

"(3) Evidence of a relevant price prevailing at a time or place other than the one described in ORS 72.1010 to 72.7250 offered by one party is not admissible unless and until he has given the other party such notice as the court finds sufficient to prevent unfair surprise."

breach. Norpac presented such evidence at trial. Assuming, without deciding, that ORS 72.7230 was applicable, the commentary to the statute explains:

> "This section is not intended to exclude the use of any other reasonable method of determining market price or of measuring damages if the circumstances of the case make this necessary."

■■ Erickson's lumber was unique. Because there was no established market, evidence of market price was speculative. Still, Norpac was permitted to introduce evidence of market price, and the jury considered it. When a product has no established market, a court may look to other criteria to measure damages. One approved method is to start with the price actually received. *See Ridgeway v. McGuire,* 176 Or 428, 158 P2d 893 (1945); *Bredemeier v. Pacific Supply Co.,* 64 Or 576, 131 P 312 (1913); *Prettyman v. Railway Etc. Co.,* 13 Or 341, 10 P 634 (1886). Erickson's expert testified that the method he used in determining the value of Erickson's lumber was recognized and used in the industry. Norpac's former lumber trader agreed. In fact, Norpac itself routinely used that method. The method did not give Erickson any special advantage. It was consistent with the way Norpac treated its other suppliers. Using Erickson's formula, the damages awarded gave Norpac about a 5 percent profit, presumably the amount it would have received had it dealt fairly with Erickson. We conclude that the formula used by the trial court was permissible. We find no prejudicial error.

Erickson contends on cross-appeal that the trial court erred in refusing to award prejudgment interest.[7] ORS

---

[7] The trial court stated:

"* * * And what it boils down to using the *Public Market* case, which sets the test, that either it must be an exact pecuniary amount that was ascertained or an exact pecuniary amount that was ascertainable either by simple computation, which we don't have here, or by reference to generally recognized standards such as market price.

"I can't conclude from the evidence that the standards used here were generally recognized standards. It seems to me that there were things relied upon which required some speculation by the jury and certainly couldn't have been things that both sides would have been able to agree was an ascertainable amount * * *.

"There were a lot of things, in my view, that came into this case that the jury would have had to consider in determining the key issue in the case, which was,

82.010 provides, in relevant part:

"(2) The rate of interest for the following transactions, if the parties have not otherwise agreed to a rate of interest, is nine percent per annum and is payable on:

"(a) All moneys after they become due; but open accounts bear interest from the date of the last item thereof.

"(b) Money received to the use of another and retained beyond a reasonable time without the owner's express or implied consent."

Oregon courts have allowed prejudgment interest on liquidated damages in breach of contract cases. *See, e.g., Dale's Sand & Gravel Co., Inc. v. Westwood Const.,* 62 Or App 570, 661 P2d 1378, *rev den* 295 Or 259 (1983); *Papadapoulos v. Oregon St. Bd. of Higher Ed.,* 48 Or App 739, 617 P2d 931 (1980). However, *Public Market Co. v. Portland,* 171 Or 522, 625, 130 P2d 624, 138 P2d 916 (1943), explains that awards of prejudgment interest are limited to cases

" "* * * [w]here "the demand is of such a nature that its exact pecuniary amount was either *ascertained, or ascertainable* by simple computation, or by reference to generally recognized standards such as market price,' and where the 'time for which interest, if allowed, must run,—that is, a time of definite default or tortfeasance,—can be ascertained." ' " (Quoting 1 Sedg. on Damages (9th Ed), 571, § 300; italics in original.)

*See McKean v. Bernard,* 54 Or App 540, 548, 635 P2d 673 (1981); Dobbs, *Remedies* 166 (1973).

 Although it is not necessary that the parties agree concerning the amount of damages, *see Walter E. Heller Western, Inc. v. Bohemia, Inc.,* 61 Or App 57, 655 P2d 1073

---

what was a proper price, and I think where the contract itself is silent as to how you determine a proper price and then considering all the different types of evidence that came into this case in determining what a proper price was, that under the test of the case that you cite it does not qualify. Logic seems to suggest that you're right.

"It's clear from the evidence that — the jury concluded that Norpac should have paid them more money and they did not have the benefit of that money during the period of the agreement. But the cases don't go that far. The cases don't go to the point of saying you used their money for a ten-year period, therefore you have to pay interest on it. They say that only when the amount meets the test of the *Public Market* case and the Court must conclude here it does not and, therefore, on that ground you would not be entitled to prejudgment interest."

(1982); *Arden-MayFair, Inc. v. Patterson,* 46 Or App 849, 613 P2d 1062, *rev den* 290 Or 149 (1980), cases allowing prejudgment interest generally require a formula for calculating damages that meets the "ascertainable" test of *Public Market Co. v. Portland, supra. See McKean v. Bernard, supra; Isler v. Shuck,* 38 Or App 233, 589 P2d 1180 (1979). Both *McKean* and *Isler* were concerned with underlying facts about the amount of money to which the formula specified in the respective contracts would apply. Here, however, the parties' contract contained no formula. Therefore, we agree with the trial court that the amount of damages was not "ascertainable."[8]

Affirmed.

---

[8] Erickson argues that ORS 82.010(2)(b) provides an independent basis for awarding prejudgment interest, *citing Investors Ins. Corp. v. Dietz,* 264 Or 164, 504 P2d 742 (1972). We disagree. *Investors Ins. Corp.* makes it clear that the statute only covers situations where one party had a contractual duty to turn over specific funds and failed to do so. Norpac did not receive money "to the use of another" as did the defendant in *Investors Ins. Corp.*