Argued and submitted January 23, affirmed March 5, petition for review denied June 24, 1997 (325 Or 438)

# PORTLAND GENERAL ELECTRIC COMPANY,
## an Oregon corporation,
### *Appellant,*

*v.*

## Harry TABER,
### *Respondent,*

### *and*

# FARMERS INSURANCE COMPANY OF OREGON,
## an Oregon corporation,
### *Intervenor-Respondent.*

## (DCV 95-5138; CA A92400)

934 P2d 538

Lee S. Aronson argued the cause for appellant. On the brief was Valencia R. Tolbert.

Thomas W. Brown argued the cause for respondent. With him on the brief were Wendy M. Margolis, Robert E. Barton and Cosgrave, Vergeer & Kester, L.L.P.

L. E. Ashcroft argued the cause for intervenor-respondent. With him on the brief was Ashcroft & Rinehart.

Before Deits, Presiding Judge, and De Muniz and Haselton, Judges.

HASELTON, J.

**HASELTON, J.**

Plaintiff Portland General Electric (PGE) appeals, assigning error to the entry of summary judgment in favor of defendant Taber and intervenor Farmers Insurance Company of Oregon. The sole issue presented is whether the proper measure of damages when a motorist negligently destroys a wooden power pole is: (a) the undepreciated cost of the lost pole or (b) the full replacement cost of a new pole. The trial court determined that, as a matter of law, PGE's recovery was limited to the lost pole's undepreciated value. We affirm.

The material facts are undisputed. PGE owns and operates an electrical distribution system, which includes approximately 235,000 wooden power poles. The age of the poles varies, with roughly 40 percent being in service for more than 40 years; the oldest is 84 years old. Among the factors that affect the life of any individual pole may be rot and decay, insect infestation, lightning strikes, other accidental destruction, and systemic relocation or restructuring. Improved treatment processes have extended the useful life of properly treated wooden poles. PGE does not replace poles on a fixed schedule, but, instead, inspects and treats pole on a seven-year cycle and replaces them on an "as necessary" basis.

PGE depreciates its poles, as a capital asset, for tax and accounting purposes. Poles are depreciated as a group, rather than individually, based on the projected useful life of all wooden transmission poles in the system. The projected useful life, for tax and accounting purposes, is 37 years.

There is no market for used power poles, and such poles have no salvage or retirement value. Historically, until 1993, whenever one of its wooden transmission poles was negligently damaged or destroyed, PGE calculated its damages for the loss of the pole as the original cost of the pole less any depreciation previously taken (the "undepreciated cost" method). Thus, if a 17-year-old pole was damaged or destroyed, PGE would invoice damages for 20/37 of the pole's total original cost.[1] On July 1, 1993, PGE altered its methodology and began invoicing allegedly liable third parties for

---

[1] In addition, PGE would seek damages for the costs of removing and replacing the damaged pole, excluding the pole's cost.

the full replacement cost of a new power pole, rather than the undepreciated cost of the damaged pole. Under the new "full replacement cost" method, if the third party actually pays the full cost of the new pole, PGE does not depreciate the new pole for tax and accounting purposes. If the third party pays for part of the new pole, PGE depreciates the balance of the cost.

On June 20, 1994, defendant Taber's pickup truck struck and damaged a wooden power pole owned by PGE, which had been installed in 1934 and was still fully functional. PGE brought this action, seeking to recover damages of $2,213 for removing and replacing the damaged pole and $407.85 for the cost of the new pole itself. Defendant agreed to pay PGE $2,213 for costs, exclusive of the actual cost of the new pole, but disputed PGE's claim for the full replacement cost of a new pole. In particular, defendant asserted that the "undepreciated value" measure of damages should control and that, under that method, PGE was not entitled to any damages, because the pole's actual age (60 years) exceeded the 37-year average useful life that PGE assumed for depreciation purposes.

On September 12, 1993, a car driven by intervenor Farmers' insured, Johnson, struck and damaged a PGE power pole that had been installed in 1976. As with Taber, PGE sought to recover the full cost of a new pole ($908.22),[2] rather than the pole's undepreciated value ($467.73). Farmers moved to intervene, ORCP 33, in the Taber litigation because the issue presented there, as to the correct measure of damages, was identical to that raised by PGE's claim against Johnson. Farmers sought a declaration that the "undepreciated cost" method was the correct measure of damages. Neither PGE nor Taber objected, and the trial court allowed Farmers' intervention.

PGE then moved for summary judgment, and Taber and Farmers cross-moved, on the dispositive replacement cost issue. The trial court granted Taber's and Farmers' cross-motions for summary judgment. PGE appeals.

---

[2] The record does not explain the difference between the replacement costs of the poles in the Taber and Johnson cases.

The question is one of first impression in Oregon. That question seems simple. Nevertheless, it has engendered a substantial division of opinion in other jurisdictions.[3] That disagreement suggests, quite correctly, that although the question is straight-forward, the answer is not.

Despite that complexity, the overarching principles that guide our inquiry are clear. In assessing compensatory damages for tortious injury to property, the measure of damages is to be determined " 'not only by what might be right for an injured person to receive in order to afford just compensation, but also by what is just to compel the other party to pay[.]' " *Mock v. Terry*, 251 Or 511, 513, 446 P2d 514 (1968) (quoting *Hansen v. Oregon-Wash. R. & N. Co.*, 97 Or 190, 201, 188 P 963, 191 P 655 (1920)). Generally, where property has been damaged, the measure of damages is the difference in value before and after the injury. *Cutsforth v. Kinzua Corp.*, 267 Or 423, 439, 517 P2d 140 (1973). Similarly, where property is destroyed, the measure of damages is generally the market value of the property. *Prettyman v. Railway etc. Co.*, 13 Or 341, 343, 10 P 634 (1886). Where, however, the property that is damaged or destroyed had no market value, "other means of valuation must necessarily be resorted to in order to appraise the property[.]" *Id.* at 344. *See also Erickson Hardwood Co. v. North Pacific Lumber*, 70 Or App 557, 568, 690 P2d 1071 (1984), *rev den* 298 Or 705 (1985).

---

[3] *Pacific Gas & Elec. Co. v. Alexander*, 90 Cal App 3d 253, 153 Cal Rptr 319 (1979); *Hartford Electric Light Company v. Beard*, 3 Conn Cir Ct 323, 213 A2d 536 (1965); *Horton v. Georgia Power Co.*, 149 Ga App 328, 254 SE2d 479 (1979); *Kansas Power & Light Co. v. Thatcher*, 14 Kan App 2d 613, 797 P2d 162 (1990); *Louisiana Power & Light Co. v. Smith*, 343 So 2d 367 (La Ct App 1977); *Mississippi Power & Light Company v. Tillman*, 291 So 2d 736 (Miss 1974); *Board of Public Utilities. v. Fenton*, 669 SW2d 612 (Mo Ct App 1984); *N.J. Power & Light Co. v. Mabee*, 41 NJ 439, 197 A2d 194 (1964); *Carolina Power & Light Company v. Paul*, 261 NC 710, 136 SE2d 103 (1964); *Polk v. Oklahoma Gas & Electric Co.*, 410 P2d 547 (Okla 1966); *Duke Power Co. v. Thornton*, 303 SC 454, 401 SE2d 195 (Ct App 1991); *Middle Tenn. Elec. Membership Corp. v. Barrett*, 56 Tenn App 660, 410 SW2d 914 (1966); *Puget Sound Power & Light Co. v. Strong*, 117 Wash 2d 400, 816 P2d 716 (1991); *Appalachian Power Company v. Morrison*, 152 W Va 638, 165 SE2d 809 (1969) (all adopting "full cost of replacement" rule).

*See Central Illinois Light Company v. Stenzel*, 44 Ill App 2d 388, 195 NE2d 207 (1963); *Public Serv. Co. of New Mexico v. Jasso*, 96 NM 800, 635 P2d 1003 (Ct App 1981); *New York State Electric & Gas Corp. v. J.C.A. Truck Leasing, Inc.*, 19 NY2d 926, 228 NE2d 393, 281 NYS2d 335 (1967); *Ohio Power Co. v. Zemelka*, 19 Ohio App 2d 213, 251 NE2d 2 (1969); *Younger v. Appalachian Power Company*, 214 Va 662, 202 SE2d 866 (1974) (all adopting "depreciated value" approach).

■     Here, it is undisputed that there was no market and, hence, no market value for used wooden power poles. Accordingly, our task is to identify the appropriate "other means of valuation," *Prettyman*, 13 Or at 344, that justly compensates plaintiff while not unfairly assessing defendant.

The parties espouse starkly contrasting methodologies, with PGE invoking the "full replacement cost" rule adopted in 14 states, and Taber and Farmers urging a variation of the "depreciated value" approach adopted in five states. Each contends that the other's approach yields unconscionable windfalls, but that its own achieves, or at least approximates, just compensation. As described below, there is—notwithstanding their Manichean oversimplification—some merit in both positions.

The original, and most frequently quoted, "full cost of replacement" case is *N.J. Power & Light Co. v. Mabee*, 41 NJ 439, 197 A2d 194 (1964). The premise of that holding, which is reiterated in virtually every "majority rule" decision, is that, because it is impossible to predict the life of any particular power pole, only the full cost replacement ensures that the power company will be fully compensated for its loss:

> "If the life of every pole were 36 years and if it were clear that each pole would be replaced at the end of that period defendants could well urge that a new pole clearly conferred a benefit beyond the amount of the damage done. The difficulty is that there is no discernible life expectancy of an individual pole and that although the period of 36 years is used for accounting purposes, the pole that was destroyed might well have served for a much longer period and the new pole may last for but a few years. Moreover, because of changes in circumstances or in technology, it cannot be known whether the pole would ever have been replaced. In short, at least upon the record before us, we cannot say with reasonable assurance that the installation of a new pole did more than remedy the wrong done. An injured party should not be required to lay out money, as defendants' approach would require, upon a questionable assumption that one day its worth will be recaptured." *Id.* at 195-96.[4]

---

[4] *See Horton*, 254 SE2d at 481; *Kansas Power*, 797 P2d at 168-69; *Mississippi Power*, 291 So 2d at 738; *Carolina Power*, 136 SE2d at 103; *Washington Water Power Co. v. Miller*, 52 Wash App 565, 570-71, 762 P2d 16, 19-20 (1988); *Appalachian Power*, 165 SE2d at 812 (all quoting *NJ Power* with approval).

*See also Puget Sound Power & Light Co. v. Strong*, 117 Wash 2d 400, 403, 816 P2d 716, 717 (1991) (rejecting argument that full cost of replacement would confer windfall on utility: "We would agree with that reasoning if the actual life expectancy of a specific pole could be determined. It cannot.").

Conversely, the minority "undepreciated cost" rule turns on the premise that requiring a party to replace a used power pole with a new pole confers an unfair windfall on the utility and that relating damages to the pole's undepreciated cost, representing the loss of the balance of the *average* projected useful life, effects fair compensation. *Younger v. Appalachian Power Company*, 214 Va 662, 202 SE2d 866, 868 (1974), exemplifies that view:

> "The record shows that Appalachian periodically inspects its transmission system and replaces poles deteriorated in normal usage. From this experience, Appalachian can determine the average useful life of poles in the system. Since in the normal course of doing business Appalachian must bear the expense of replacement costs at some reasonably ascertainable future time, recovery from a tortfeasor of full replacements costs at an earlier time would overcompensate the injury sustained. Thus, if a pole deteriorated in normal usage was to be replaced and an automobile damaged it an hour before the replacement crew arrived with the new pole, Appalachian would gain a windfall if the tortfeasor is required to pay the full replacement costs Appalachian was about to expend. On the other hand, if an automobile damaged a pole an hour after it had been replaced in the normal course of replacement, Appalachian would be less than whole if the tortfeasor is permitted to pay less than full replacement costs. In each case, the actual injury sustained by Appalachian is related to the useful life of the pole. In the former case, Appalachian would have enjoyed the full anticipated use of its property and incurred no unanticipated expense. In the latter case, Appalachian would have been deprived of the full anticipated use of its property and would have incurred an expense which, but for the tort, would have been deferred for the useful life of the pole."

*See also Puget Sound Power and Light Co. v. Strong*, 59 Wash App 430, 434-35, 798 P2d 1162, 1164 (1990), *rev'd* 117 Wash 2d 400, 816 P2d 716 (1991) (rejecting "total cost replacement"

in favor of "undepreciated value" measure where defendant destroyed 14-year-old pole: "Puget would gain an estimated additional fourteen years of service life if it were permitted to recover the cost of a new pole. Such compensation exceeds the loss incurred by Puget and, thus, would result in a windfall to Puget.").

In related fashion, in *Ohio Power Co. v. Zemelka*, 19 Ohio App 2d 213, 251 NE2d 2, 4-5 (1969), the court held that, just as the utility relied on "sound accounting principles," in projecting poles' useful life for accounting and taxation purposes and in assessing other costs associated with the removal and replacement of damaged poles, the same actuarial assumptions should bind the utility in determining the value of a lost pole:

"We feel that justice is a two-way street. Just as plaintiff is entitled to be compensated for such items as cost of pole storage and administration and engineering expenses, because the application of sound accounting principles establishes that these indirect expenses are properly part of the damages suffered by a utility company when one of its utility poles is damaged, so defendants are entitled to use sound accounting principles to establish the life expectancy of a utility pole so that the depreciation of such a utility pole can be readily determined by the application of sound accounting principles.

"It is true that a utility pole has a variable life expectancy, just as any other item of personal property, such as an automobile, furniture, etc., but sound accounting principles can establish a life expectancy of such items. * * * All variables can be attacked on the basis of uncertainty; however, for business and legal reasons, we need to establish uniform definite standards for variable expenses on the basis of sound accounting principles. We feel that there is no difference in the application of sound accounting principles to determine the accrued depreciation of a damaged utility pole with a variable life expectancy than to determine the indirect costs of repairing the damaged pole by the application of sound accounting principles to the variable costs of such expenses."

As the dispute is framed by the parties, we are, thus, faced with an "either/or" choice between two contending formulations. That choice is, frankly, less than satisfying for at least three reasons.

First, it is beyond dispute that either measure of damages will, at least in some circumstances, produce seemingly unjust results. For example, if the "full replacement cost" method were applied here, PGE would, in effect, be allowed to trade a 60-year-old pole, which has survived 23 years past its projected useful life, for a brand new pole. Conversely, if the "undepreciated cost" method were applied to the same 60-year-old pole, Taber would pay nothing for PGE's loss of a pole that was fully functioning and useful until Taber's pickup damaged it—and that might still be in use but for Taber's negligence.[5] Second, many, if not all, of the decisions that adopt either rule speak in terms of the speculative nature of projecting the life expectancy of *any particular pole*. It is true that "there is no discernible life expectancy to any individual pole[.]" *N.J. Power*, 197 A2d at 195. However, with all respect to those courts, and to the present litigants who invoke their reasoning, their apparent preoccupation with that truism seems inapt. This dispute is special, perhaps unique, in that it concerns the appropriate valuation of (1) peculiar property (power poles), (2) that is owned by a very limited class of persons (utilities), and (3) whose valuation is the subject of frequent disputes and litigation. To be blunt: This dispute is not about the fairness or "speculativeness" of valuing the loss of a single 60-year-old power pole in Clackamas County; it is, instead, about the proper method of compensating PGE for the loss of any of the 235,000 poles in its transmission system. Our task, then, is to identify the measure of damages that most closely effects just compensation *systemically*, in power pole loss cases in the aggregate.[6]

Third, our performance of that task is skewed by the fact that the parties present us with only two options and the evidentiary record was tailored to those two options only. There are, at least in the abstract, alternative methodologies

[5] The "windfall" consideration appears to be, at least in part, a factor of the pole's age. For example, if the damaged pole is only a year old, any "windfall" from employing a "full replacement cost" measure is seemingly less pronounced. Similarly, employing the "undepreciated cost" measure, which would require the tortfeasor to pay 36/37 of the pole's cost, would not seem to yield any appreciable windfall to the tortfeasor.

[6] PGE advises us that at least eight cases involving claims for damage to its power poles are being held in abeyance in various courts pending the disposition of this appeal.

that might mitigate the cross-cutting "windfall" concerns and better effectuate just compensation.[7] However, because of the manner in which the record was developed on summary judgment, there is no basis on this record for determining the practicability of such approaches. We cannot prescribe them in an evidentiary void.[8]

■   Faced with the "either/or" choice, we opt for the "undepreciated cost" approach. That measure, although imperfect, comes closer to promoting just compensation in power pole damage cases as a whole than does the "full replacement cost" method.

Our holding rests on reasoning similar to *Ohio Power*'s observation that "justice is a two-way street." 251 NE2d at 4. The only evidence in this record as to the average useful life of PGE's wooden power poles in the aggregate is that, for tax and accounting purposes, PGE depreciates the poles on the basis of a 37-year useful life. We fully appreciate that different considerations *may* underlie projections of useful life for tax and accounting purposes, as opposed to property loss valuation purposes. Nevertheless, PGE has not explained why it should reap the benefit of a 37-year useful life for tax depreciation purposes but, concurrently, claim that the 37-year figure is not an accurate benchmark of average projected life in crafting a measure of damages that applies to all power poles. Nor does PGE explain why the

---

[7] For example, during oral argument, we explored with counsel a method by which the life expectancy of power poles would be projected, actuarially, in a fashion similar to human life mortality tables. Thus, even if the *average* useful life of a wooden power pole in PGE's system were assumed to be 37 years, a 60-year-old pole might (hypothetically) have a projected remaining life of 12 years, and damages could be based on that period. Similarly, two-year-old power poles might, as a class, have an *average projected life of 30 years, and damages to any particular two-year-old pole would be based on that 28 years of "lost life."* In response to our inquiries, counsel explained that the record contained no evidence as to whether the actuarial data necessary to implement such an approach existed or could be practicably developed. *Cf. Kansas Power*, 797 P2d at 164 ("The average age of a male tells us no more about how long John Doe will actually live than the average age of a utility pole tells us how long an individual pole will remain in service.").

[8] Other parties in other cases would, of course, be free to present arguments and supporting evidence for a measure of damage that differs from those that the parties espouse here.

"undepreciated cost" approach, which it has applied historically, became somehow unjust or incompletely remedial as of July 1, 1993.

Conversely, adoption and application of the "full cost replacement" measure in every power pole loss case would systematically overcompensate PGE. In every case, PGE would be receiving a new pole for a used and depreciated pole. Regardless of whether that might yield an appreciable windfall in any given case, the inescapable consequence would be that PGE would be unjustly overcompensated in the aggregate.

The trial court did not err in adopting and applying the "undepreciated cost" measure of damages.

Affirmed.