Argued July 9, affirmed September 6, 1974

WEBER, *Appellant, v.* KAMYR, INC. ET AL,
*Respondents.*

525 P2d 1307

618

*James B. Griswold,* Portland, argued the cause for appellant. With him on the briefs were Green, Griswold & Pippin, Portland.

*Edward H. Warren,* Portland, argued the cause for respondent Worthington Corporation. With him on the brief were Hershiser, Mitchell & Warren, Portland.

*John Gordon Gearin,* Portland, argued the cause for respondent Kamyr, Inc. With him on the brief were Jeffrey M. Batchelor, and Gearin, Cheney, Landis, Aebi & Kelley, Portland.

Before O'CONNELL, Chief Justice, and McALLISTER, DENECKE,* HOLMAN, HOWELL, and BRYSON, Justices.

HOLMAN, J.

Plaintiff, an employee of Boise Cascade, brought an action against Kamyr, Inc., and Worthington Corporation to recover for injuries suffered during his employment when a flash tank pump exploded and sprayed him with a heated liquor used in the manufacture of paper pulp. Upon completion of the initial trial, Worthington was granted a directed verdict and the jury hung as to the defendant Kamyr. Upon retrial against Kamyr alone, the jury returned a defendant's verdict. Plaintiff appealed from both verdicts.

In order to increase its production facilities, Boise Cascade entered into a contract with Kamyr to build a digester system. Kamyr was responsible for building the complete digester system except for the flash tank pump, which Boise Cascade undertook to furnish and install and which was purchased by Boise Cascade from Worthington. Plaintiff charged Kamyr with negligence in the planning and construction of the digester system as well as with strict liability for

---

* Denecke, J., did not participate in the decision of this case.

furnishing a defective system. He charged Worthington with being strictly liable for furnishing a defective pump.

■ Plaintiff contends there was adequate evidence of the pump's defectiveness to go to the jury. The pump had a specified maximum operating pressure of 100 pounds per square inch gauge. All evidence, including that furnished by plaintiff, was to the effect that at the time the pump casing failed, it was being subjected to internal pressure far in excess of this amount. The pressure exerted from the discharge end of the pump was so great that the liquor was being forced through the pump in a direction opposite to that which the pump was pumping.

There was testimony about which there was considerable dispute concerning the extent of external stress which was placed on the casing by the expansion of heated pipes which led into the pump. In addition, there was testimony concerning hydraulic shock to which the pump would be subjected if it was started against a reverse flow of liquor going through the pump. Discounting completely, however, all evidence concerning external pressure and hydraulic shock, the witnesses were of the unanimous opinion that the internal pressure exerted by the liquor in the pump was in excess of that for which the pump was rated, sold, and purchased.

It is urged by plaintiff that the following testimony of his expert shows that the casing was defective:

"Q. Now, you testified as to the variations that you found around the site of the fracture of Plaintiff's Exhibit 1. And I am asking your opinion of whether you feel that this would be properly—

proper engineering construction to have a pump housing with that variation in wall thickness around the circumference.

"A. Well, if the pump were designed for the least thickness, then it would not constitute a defect. But, in my judgment this amount of variation would have caused excessive stresses, so in this particular instance it would have, in my judgment, have been a defect.

"Q. And would that defect in the thickness of the pump casing wall be a contributing factor to the failure as you found it?

"A. Yes."

However, the same witness testified that at the time the casing exploded it was being subjected to an internal pressure which was in excess of that for which the pump was manufactured. As the trial judge pointed out at the time he granted the directed verdict to Worthington, even if the unevenness in the thickness of the casing was a cause of its ultimate bursting, so long as it did not burst until greater pressure was applied than that which the pump was manufactured, sold and purchased to withstand, such unevenness could not be considered a defect for which the manufacturer was responsible. The trial judge did not commit error in ruling that there was no evidence of any defect in the pump which was a cause of the accident.

■■ As to the defendant Kamyr, plaintiff first contends that the trial court erred in failing to grant his motion for a new trial. The first ground for a new trial arose out of a request made of the judge by the jury after it had commenced deliberations. The jury sent a note to the judge, asking for "the number of the exhibit which was the contract between Kamyr and Boise Cascade." In the absence of counsel, the judge answered that the exhibit was Number 40. Upon re-

turning to the courtroom and being told of the jury's inquiry, counsel reminded the judge of existing additional exhibits which were supporting documents to exhibit 40. The court thereupon called in the jury, told it of the supporting documents and gave it the numbers of those exhibits.

Plaintiff now argues that 1) the judge's original answer to the jury's question was incorrect; 2) had it been correct, his statement would have been a comment on the evidence and therefore improper; and 3) when the trial judge reinstructed the jury, he should have told it that his first answer was in error, rather than telling it, as he did, that he was clarifying his prior instruction on the matter.

We believe plaintiff is being hypercritical when he says that answering such a question of the jury correctly would be improper as a comment on the evidence. Also, in the present case, the subsequent instruction to the jury corrected the judge's original error and properly clarified the matter. The jury ultimately received the correct information and no harm was done.

■ The second ground for a new trial was the alleged misconduct of a juror. Plaintiff's principal expert witness filed an affidavit in which he stated that an unnamed white male juror in the case approached him and said something about the case, but that he, the witness, did not respond. When this occurred, the witness had just finished testifying in this case and was sitting on a bench outside another circuit judge's courtroom on the same floor of the courthouse because he was a party to another case which was being tried at the same time in that courtroom. At that moment the witness's opponent in that trial came up, and upon

recognizing the juror, spoke to him, and the two walked off together. The witness further stated in his affidavit that there was considerable animosity between his opponent and himself and that, if given the opportunity, his opponent would have maligned him to the juror. Upon being notified of this occurrence after the completion of the trial, the trial judge telephoned the only two white male jurors who sat on the case and inquired if either of them had had such a conversation or if either one knew anyone by the name of the witness's opponent in the other law suit, but both denied the conversation or knowing anyone by that name.

Plaintiff contends the trial judge abused his discretion by making the inquiry he did instead of allowing the jurors to be interviewed by counsel or to be brought into court for interrogation. Within reasonable limits this court should allow trial judges fairly wide discretion in handling such inquiries. Also, there is a public policy in not extending such inquiries past the point of making reasonably sure that the parties are not deprived of a fair trial. Allowing unnecessarily extended inquiries would provide too great an invitation to disappointed litigants to bring pressure upon members of the jury to repudiate their decisions. The public has an interest in the finality of litigation. *State v. Gardner,* 230 Or 569, 573-75, 371 P2d 558 (1962).

It was obvious the affiant could not specifically identify which of the jurors was allegedly involved; therefore, there was the possibility he was in error. The trial judge recognized this and also that even if the affiant was not mistaken, it did not necessarily follow that the affiant's opponent had spoken derogatorily of the affiant to the jeopardy of plaintiff's

case. The court was concerned about the matter, however, and made the following comment:

> "I want to get to the bottom of it. And the implications are serious, and I think we ought to find out personally where the truth lies in this.
>
> "I will contact the two male jurors, make a preliminary inquiry as to whether or not the basic assertion made by Talbott is accurate, and if they are, I will order each juror, the two jurors, brought in for further examination.
>
> "* * * * *.
>
> "What I am suggesting I think is proper. I don't like to do it. I don't ever like to talk to the jurors relative to the case. I just don't like the practice, and for that reason I want to limit it only to start inquiring of the juror the kind of inquiry I suggested be made."

The trial judge recognized the underlying interests and took the steps which appeared to him best suited to serve those interests. At this distance we cannot say the steps he took were inappropriate to the occasion and we therefore affirm them.

■ Plaintiff next contends the court erred in permitting Kamyr's attorney to ask a witness, contrary to the provisions of ORS 656.595 (2),[1] whether his employer, Boise Cascade, had a direct financial interest in the case. The witness answered that Boise Cascade did have an interest in the outcome. Plaintiff claims this demonstrated to the jury that plaintiff was receiving Workmen's Compensation and therefore the question and answer were both improper and prejudicial.

---

[1] ORS 656.595 (2): "In any third party action brought pursuant to ORS 656.001 to 656.794, the fact that the injured workman or his beneficiaries are entitled to or have received benefits under ORS 656.001 to 656.794 shall not be pleaded or admissible in evidence."

This matter was taken up with the trial court prior to the time the evidence was given, and the court decided it was proper to show any interest which the witness might have, by way of his employer's interest, in the outcome of the litigation as long as Workmen's Compensation was not mentioned. The trial judge was of the opinion that the question and answer would not suggest Workmen's Compensation, as there are many other ways in which Boise Cascade could have an interest in the litigation. It is our opinion that it would be an unusual juror who would connect the answer to Workmen's Compensation and that the trial judge weighed the competing interests properly, proceeded accordingly, and was not in error.

■ Plaintiff also contends the trial court erred in allowing the defendant to show by cross-examination that in the original trial, which ended in a hung jury as to Kamyr and a directed verdict in favor of Worthington, plaintiff's expert witness had testified that one of the causes of the accident was Worthington's defective pump. Plaintiff argues that this was improper because Worthington's directed verdict in the first trial, which was in full force at the time of the second trial, was a judicial determination that the pump was not defective and that this determination was binding upon Kamyr.

Assuming, but not deciding, that plaintiff's underlying premise is correct, Kamyr would still be able to show that the witness at another time had given an opinion which included other reasons for the explosion of the pump in addition to those he was presently expressing. If Kamyr was bound by the directed verdict between plaintiff and Worthington, the question would still be permissible, not to show that the

pump was a cause of the accident, but to show that the witness's prior opinion was somewhat different than the opinion he was presently expressing.

■ Plaintiff also contends the court erred in not sustaining an objection to testimony concerning the effect of starting the pump when the valve downstream from it was open. Kamyr was attempting to show that the pump was started against an open valve at a time when the liquor was flowing in a direction opposite to that which the pump was pumping and that this caused hydraulic shock which was instrumental in breaking the pump. The purpose of the pump was to pump the liquor from the flash tank to the evaporator in another building. Instead of the tank pumping dry, the tank was filling up. Because of the condition of the valves, this meant that because of pressure exerted on the downstream side of the pump, the liquor was flowing back through the pump against the direction it was pumping. The operator testified that, in an attempt to get the pump to function more efficiently, he stopped and started it several times. With this background, the following transpired during the cross-examination of a Boise Cascade employee:

"Q. * * * * *.

"Your instructions include instructions whether or not the pump shall be started against a closed valve?

"A. Yes.

"Q. All right. And what do your instructions provide in that regard?

"A. Normally start against a closed valve on this type of pump.

"Q. What would be the effect if that pump were opened, if the pump were opened and shut rapidly against an open valve?

"MR. GRISWOLD: Your Honor, I think I'll object to that. There is no evidence in this case that such a situation existed.

"THE COURT: Well, there is evidence that the pump was started and stopped against an open valve, is that not so?

"MR. GRISWOLD: That is not correct, Your Honor.

"MR. GEARIN: I submit it is, Your Honor.

"THE COURT: Well, I don't know. I'll let him answer the question and you can ask him.

"Q. (By Mr. Gearin) What happens, Mr. Paskett, when you open and close or, rather, stop and start the pump rapidly against an open valve?

"A. You can set up circumstances for surges and waves.

"Q. When you say waves, what kind of waves?

"A. Hydraulic shock."

Kamyr made several unsuccessful attempts to show that there was evidence that the pump was started against an open valve. However, it points to no evidence which indicates it succeeded. This does not necessarily mean that it was error to permit the witness to answer the question. One of the bitterest points of contention was whether the pump was started against an open or a closed valve and so much was being made of the point, that it was proper to let the jury in on the importance of having the valve closed. A jury should not be required to operate in a vacuum. Plaintiff claims the judge aggravated the situation by stating at first that he thought there was evidence that the pump had been started against an open valve. However, when the attorney disagreed he stated he did not know. We believe there was no error and, in any event, we believe there was no prejudice.

■ Plaintiff contends the trial court erred in taking from the jury specification of negligence Number 6 of plaintiff's negligence count. The specification was as follows:

"(6) In failing to include within the plans and drawings and to install a saddle support or other device which would have prevented a bending motion of the pipe bolted to the flash tank pump suction flange and would have prevented improper external pressures upon the pump housing, and would have caused proper operation of the expansion joint referred to in Item 5 herein."

The specification was important because a 14-inch pipe came down from the flash tank, which tank was above the pump. When the pipe came down to the level of the pump, there was a 90-degree elbow to permit the liquor to go into the pump. There was a 3-inch pipe bolted into the cement floor which served as a support for the elbow in the 14-inch pipe. There was testimony that this was an insufficient support to withstand the tremendous downward pressure exerted by the 14-inch pipe when its length was expanded by the hot liquor. There was further evidence that the expansion caused the pipe leading into the pump from the elbow to be forced downward, placing a strain upon the pump housing which contributed to its failure.

However, there was no error in taking the specification from the jury because it was covered by specification of negligence Number 9 in plaintiff's complaint which concerned the same matter but which was in much broader terms. Specification Number 9 was as follows:

"*In* designing and *installing the system in such manner with the* valves and *piping leading* to and *from the Kamyr flash tank that the flash tank pump would be placed under unusual stresses and*

*strains from* internal and *external forces and pressures,* and in failing to correct such installations when defendants knew or should have known such stresses and strains had caused an earlier failure of the flash tank pump housing." (Emphasis ours.)

It is not error to strike an allegation of negligence which duplicates another allegation. The trial court properly struck the narrower specification and submitted the broader one to the jury.

■ Plaintiff also asserts the trial court erred in taking from the jury specification of negligence Number 8, which was as follows:

"(8) In failing to include within the operating manual proper or adequate warnings of anticipated dangers if improper bypass procedures were used."

The bypass procedures were furnished to Boise Cascade by Kamyr. Before such a specification of negligence could be submitted to the jury, there had to be some evidence that Boise Cascade failed to follow the bypass instructions given to it by Kamyr. Plaintiff points to no evidence in the record of any deviation from Kamyr's bypass procedures by Boise Cascade's employees which caused the accident. In the absence of such deviation the failure to warn of the dangers of such deviation could not have been a cause of the accident. In his reply brief plaintiff seems to be confusing failure to give proper bypass instructions with failure to warn of the dangers involved if the bypass instructions as given were not followed. We read the specification of negligence to address itself to the latter failure.

■ Plaintiff states the trial court erred in failing to give the following requested instruction:

"The evidence shows that the relationship between defendant Kamyr, Inc. and plaintiff's em-

ployer Boise Cascade arose out of an agreement consisting in part of a written contract and in part by various plans, drawings, diagrams, and instructions. If in considering all of these exhibits you find that the nature of such agreement is ambiguous and also [open] to more than one reasonable construction then you are to construe the contract most strongly against the party who prepared the documents."

The contract between Kamyr and Boise Cascade provided that Kamyr had no responsibility for furnishing or installing the flash tank pump. There was a dispute between plaintiff and Kamyr as to whether it was Kamyr's or Boise Cascade's duty to put in a check valve at the discharge end of the pump to keep the liquor from flowing backwards through the pump. It was Kamyr's position that if the pump furnished by Boise Cascade required a check valve at the discharge end, it was Boise Cascade's obligation to install it as part of the pump installation. It was plaintiff's position that under the contract Kamyr was responsible for everything except the pump and that if a check valve was required, it was Kamyr's responsibility to install one under its contract.

It is our conclusion that the trial court was correct in refusing to give the instruction because it was not appropriate to the determination which the jury had to make. Plaintiff correctly contends that it is the rule in Oregon that ambiguities in a contract are normally to be resolved against the scrivener. However, plaintiff fails to differentiate between rules of interpretation for the court and those instructions which serve as guides for the jury. Theoretically, juries do not construe contracts. They decide facts. Courts construe contracts by giving legal effect to such findings of fact. It is proper for courts to instruct

juries as to alternate constructions which would apply, depending on the possible outcome of their factual deliberations. Appropriate to the occasion is the following statement from 53 Am Jur 229, Trial § 270:

> "* * * The rule laid down in cases which consciously regard the lines that separate the function of the court from that of the jury is substantially that the construction of the contract is always a matter of law for the court no matter how ambiguous or uncertain or difficult its terms, and the jury can only assist in determining disputed questions of fact; that if the circumstances to be considered in the interpretation of the contract are in dispute and the meaning of the contract depends thereon, the determining of the disputed facts must be left to the jury, but the proper construction of the contract cannot be left to them." (Footnote omitted.)

The requested instruction is one which courts use in the interpretation of contracts and one which courts take into consideration when instructing the jury as to what results to reach depending on how the jury decides the facts; however, the rule is not a proper subject of an instruction to a jury.

■ Plaintiff claims the trial court erred in failing to give the following instruction:

> "I have heretofore defined the term 'proximate cause' to you. This term includes in it the concept of 'foreseeability,' or the concept that a reasonable person could anticipate the occurrences leading to a particular harm.
>
> "It is for you to determine whether, under all of the facts and evidence, a designer and manufacturer of a digester system as in this case could anticipate the use to which the equipment was being put at the time of plaintiff's injury.
>
> "If you find that the actions of the Boise Cascade employees at the time and place of plaintiff's

injuries were such as could have been reasonably foreseen by the defendant Kamyr, this defendant's actions could then be considered by you as the proximate cause of plaintiff's injuries.

"You are then to determine whether or not the acts of defendant Kamyr were of a negligent nature as I have defined that term to you."

Too many times to make worthwhile their citations, this court has attempted to discourage the use of the term "proximate cause" because of the resultant confusion between negligence and causation. Be that as it may—the trial court did use the term and gave the standard definition. Plaintiff wished something more refined relating particularly to foreseeability which, of course, has nothing to do with cause in fact or causation as this court uses the term, but has to do, instead, with the concept of negligence. The trial court did instruct on the importance of foreseeability when instructing upon negligence by using the following language:

"* * * to use reasonable care in order to avoid damage to himself or to another person in any situation in which it could be reasonably anticipated * * *.

"* * * The care that we are concerned with should be in keeping with dangers apparent or reasonably to be expected at the time and place in question * * *."

Also, the standard definition given by the trial court of proximate cause has in it the language "a natural or a reasonably probable consequence of such act." It is our opinion that the trial court adequately covered the subject of foreseeability in the instructions it gave.

■ Plaintiff's 11th and last assignment of error as to the defendant Kamyr is a claim that the court erred in giving an instruction to which plaintiff, how-

ever, took no exception. We therefore give it no consideration because we do not consider the alleged error to be of sufficient consequence to take cognizance of it without its having been called to the trial court's attention.

The judgment as to both defendants is affirmed.