Argued and submitted July 21, 1982, reversed and remanded March 2, reconsideration denied April 1, petition for review denied April 26, 1983 (294 Or 792)

SUNSET COATINGS CO., INC.,
*Respondent,*

*v.*

DEPARTMENT OF TRANSPORTATION et al,
*Appellants,*

*v.*

AMERICAN FIDELITY FIRE INSURANCE,
*Respondent.*

(A7912-05814; CA A20661)

660 P2d 164

Leslie B. Hampton, Assistant Attorney General, Salem, argued the cause for appellants. With him on the briefs were Dave Frohnmayer, Attorney General, Stanton F. Long, Deputy Attorney General, and William F. Gary, Solicitor General, Salem.

Richard A. Hayden, Portland, argued the cause for respondent Sunset Coatings Co., Inc. On the brief was John M. Volkman and Stoel, Rives, Boley, Fraser and Wyse, Portland.

Elizabeth Yeats, Portland, argued the cause for respondent American Fidelity Fire Insurance. With her on the brief were John Spencer Stewart and Kobin & Meyer, Portland.

Before Gillette, Presiding Judge, and Warden and Young, Judges.

GILLETTE, P. J.

## GILLETTE, P. J.

The state appeals from a judgment entered on a jury verdict in favor of plaintiff in this action for breach of contract. The central issue is whether the contract was ambiguous and therefore was correctly submitted to the jury for interpretation. We reverse.

Plaintiff and the Highway Division (Division) entered into a contract in January, 1979, that provided that plaintiff would sandblast and paint the Harrisburg Williamette River bridge for a bid price of $124,756. The contract provided specifications for the sandblasting and the painting. It required inspection by the Division of each phase of the operation. Work on the project began in the spring of 1979. On July 10, 1979, after completing approximately one-half of the contract work, plaintiff notified the state that it would not complete the project. The state then sought bids for completion. Finding the bids unacceptable, the state completed the work using its own personnel.

Plaintiff thereafter filed this action, contending that the state had breached the contract because it had required plaintiff to perform work beyond that required in the contract specifications and had interfered with plaintiff's performance. The state counterclaimed for its cost in completing the job. At trial, the trial court determined that the specifications for painting and sandblasting were ambiguous and submitted the question of the interpretation of the contract to the jury, after admitting evidence as to the meaning intended by the parties. The jury returned a verdict for plaintiff.

The state argues together its first 14 assignments of error, involving admission of evidence and the giving and refusal to give various instructions. The issue central to all of them is whether the contract specifications regarding painting and sandblasting are ambiguous.

The specifications relating to sandblasting are:

*"Blast Cleaning* - Where not in conflict with these specifications, all steel shall be blast cleaned in conformance with Steel Structures Painting Council Specifications SSPC-SP 6-63 'Commercial Blast Cleaning.' The appearance of the blast cleaned surface shall confirm to Pictorial Standard Sa 2 of ASTMD 2200 (SSPC Vis 1-67T)."

SSPC-SP 6-63 referred to in the first sentence of the specification provides:

"A Commercial Blast Cleaned Surface Finish is defined as one from which all oil, grease, dirt, rust scale and foreign matter have been completely removed from the surface and all rust, mill scale and old paint have been completely removed except for slight shadows, streaks, or discolorations caused by rust stain, mill scale oxides or slight, tight residues of paint or coating that may remain; if the surface is pitted, slight residues of rust or paint may be found in the bottom of pits; at least two-thirds of each square inch of surface area shall be free of all visible residues and the remainder shall be limited to the light discoloration, slight staining or tight residues mentioned above. Photographic or other visual standards may be used as provided in the Appendix to modify or further define the surface if specified in the contract."

The Pictorial Standard Sa 2 referred to in the second sentence of the specification is contained in *Pictorial Surface Preparation Standards for Painting Steel Structures,* admitted as an exhibit.

Plaintiff contends that the specifications are ambiguous because the written description allows some paint residues to remain, while the photographs in Pictorial Standard Sa 2 show steel surfaces that have not been painted, but have rusted, and have no paint residues.

The question whether a contract provision is ambiguous is one for the court. *Timberline Equip. v. St. Paul Fire and Mar. Ins.,* 281 Or 639, 643, 576 P2d 1244 (1978); *Olson v. GAF Corp.,* 53 Or App 71, 75, 630 P2d 921, *rev den* 291 Or 514 (1981). If the court determines that the provision is not ambiguous, the interpretation of the contract is also one of law for the court. *Timberline Equip. v. St. Paul Fire and Mar. Ins., supra.* In determining whether a contract provision is ambiguous, the court may consider "the circumstances under which it was made, including the situation of the subject and of the parties, * * * so that the judge is placed in the position of those whose language he is interpreting." ORS 42.220; *see* ORS 41.740. We therefore turn to the question whether the trial court correctly concluded that the sandblasting provisions were ambiguous. We conclude that they are not and that the court therefore erred.

The dispute is over whether the contract requires that *all* paint residues be removed. It is clear that it does not. The written description states that "at least two-thirds of each square inch of surface area shall be free of all visible residues" and that the remainder of the surface may contain only "slight shadows, streaks, or discolorations caused by rust stain, mill scale oxides or slight, tight residues of paint or coating * * *." The photographs show unpainted, but rusted, steel surfaces after various degrees of sandblasting. The Sa 2 photographs are as consistent with the written description as it seems to us possible to be. Although the discoloration in the photographs is caused by rust, it is consistent with the written description. We do not believe that it is of consequence that the photographs show rust rather than paint. They show a surface from which *most* of the residues, whether rust or paint, have been removed. They do not show a surface from which *all* residues have been removed. The photographs are entirely consistent with the written description, and neither requires that the surface be entirely free of all residues of whatever kind.[1] The trial court erred in admitting evidence regarding, and in submitting to the jury the interpretation of, the sandblasting specifications.

The trial court also concluded that the painting specifications are ambiguous. Those specifications provide:

*"Number of Coats and Film Thickness* - Paint shall be applied to the cleaned steel surfaces as follows:

| "Coat | Formula | Minimum Dry Film Thickness |
|---|---|---|
| Prime | 12-69 | 1-1/2 mils |
| 1st Base | 13-69 | 1-1/2 mils |
| 2nd Base | 14-69 | 1-1/2 mils |
| 1st Finish | 317-74 (tinted) | 1-1/2 mils |
| 2nd Finish | 317-74 | 1-1/2 mils |

"It shall be understood that a coat shall be as many applications as necessary to produce the specified minimum film thickness."

---

[1] Plaintiff argues that the contract is ambiguous, pointing to the fact that the state's inspector construed it to mean that *no* paint residues could remain on the surface. This does not create an ambiguity; it may be evidence that the state breached the contract.

*"Paint Film Thickness* - The thickness of all paint coats shall confirm to the following requirements:

"(a) Film thickness shall be measured above the peaks of the profile of the anchor pattern in the substrate but shall not include the thickness of previous coats.

"(b) One hundred percent of all measurements shall be within the specified minimum dry film thickness.

"Where thickness measurements in accordance with the above fall below the specified minimum, additional applications of paint shall be made as necessary to meet the minimum paint coat thickness specified."

*"Inspection* - Each phase of cleaning and painting shall be inspected and approved by the engineer before succeeding phases are commenced by the contractor. The contractor shall provide the inspector access to all areas where work is being performed.

"The surface of cleaned steel shall be approved before the first application of paint is made, and each coat of paint shall be inspected for conformance to specifications before succeeding coats are applied.

"Surface preparations and paint film thickness will be inspected and measured for conformance to the requirements of the specifications. Instruments and equipment used for measuring and inspecting may include but are not limited to the following:

"* * * * *."

Plaintiff's contention is that it is the industry practice to *inspect* visually after each coat of paint is applied but to *measure* only after the third layer of base paint and after the final coat of finish paint. Plaintiff was permitted to present evidence in support of that contention. The state argues that that evidence was improperly admitted, because the contract is unambiguous. Again, we agree. We conclude that, even if there is or was such an industry practice, the painting specifications are not ambiguous. The specifications require that *each* coat be 1-1/2 mils thick and define a coat as "as many applications as necessary to produce the specified minimum film thickness." They also provide that measurement of film thickness shall not include the thickness of previous coats. It is not reasonable to read this language as permitting measurement only after the three base coats and again after the two final coats.

The trial court erred in submitting to the jury the question of the interpretation of these provisions as well.

Because we have concluded the contract provisions whose interpretation was submitted by the trial court to the jury are not ambiguous, it follows that the instructions under which the question of the contract interpretation was submitted were also erroneously given, and the case must be reversed and a new trial had.

■   We will address the state's two final assignments of error because they may arise on re-trial. The state contends that the trial court erred in instructing the jury as follows:

> "* * * Now I instruct you that the Oregon Highway Division specified in its specifications the method to be used to perform the blast cleaning. In the specifications, the State specified that all steel 'shall be blast cleaned in conformance with Steel Structure Painting Council's Specifications SSP-SP 63 "Commercial Blast Cleaning." '

> "I instruct you that the State's specifications that blast cleaning be performed by a commercial blast was and *is in the nature of a warranty that if it is complied with, satisfactory performance will result.*

> "If you find from the evidence that the contractor, by use of the commercial blast, was unable satisfactorily to remove all material which the State desires by the blasting operation, and was directed to intensify the blast cleaning by use of a near white blast, then the contractor is entitled to such additional cost incurred in the performance of the near white blast operation." (Emphasis supplied.)

The basis for this instruction is *Barbour & Son v. Highway Com.,* 248 Or 247, 433 P2d 817 (1967), which also involved a contract calling for commercial blast cleaning of a bridge. The contention there was that the contractor had encountered unexpected areas of severe rust that could not be removed by normal sandblasting methods, but required hand chipping. The contract required that the contractor "remove all rust." However, that contract specified that the contractor was to remove all rust *by commercial sandblasting.* The court held that, if commercial sandblasting would not remove the rust, the contractor was not obliged to absorb the extra expense of removing the heavy rust

incrustations. A specification that provided that commercial sandblasting was to be used when, in fact, commercial sandblasting would not remove the heavy rust was "in the nature of a warranty that, if it is 'complied with, satisfactory performance will result' * * *." 248 Or at 257.

We do not believe that case is controlling here, even though both cases involve use of the term "commercial sandblasting." The specifications at issue here define "A Commercial Blast Cleaned Surface Finish" by the *end result,* not by the method by which it is to be achieved, *i.e.,* the specification describes the finish that will satisfy the contract requirements. The instruction given in this case suggests that the state warranted that it would be satisfied if a particular method were used. That is not the case. The instruction should not be given on retrial.

The state's final assignment of error concerns one of the instructions on damages:

"If, alternatively, you find that the contract has not been abandoned and cancelled because the changes were not radical, but that the State, by its own acts, caused the work to be done by Sunset Coatings to be more expensive than it would otherwise have been, according to the terms of the original contract, a different measure of damage applies. In that event, the State is liable to Sunset Coatings for the increased cost. I instruct you, if you find such a breach cost was $147,000.56 less $58,425 paid, or $88,642 plus $14,757 for loss of profit for a total — for a loss — you may award more than the sum, in that instance, $110,000.25."

The jury returned a verdict in favor of plaintiff for $110,023.[2]

The state argues that this instruction was erroneous on two bases. First, it contends that under it the jury could have awarded damages to plaintiff without finding that the state had breached the contract. The court, however, instructed the jury that Sunset could recover

---

[2] In its instructions, the court referred to the amount that could be awarded plaintiff as $110,000.29, $110,000.25 and $110,000.23. Although the constituent figures used by the court in its instructions do not result in any of those figures, or the figure reached by the jury, the parties do not complain about the figures used in the instruction.

damages only if it had proved that it had a valid excuse for abandoning the project as a result of a material breach of the contract by the state. In the context of all the instructions given, we do not believe that the jury could have been misled as the state suggests.

The state also contends that the final part of the instruction could be read as directing the amount of damages to be awarded if the jury found a breach. The parties had stipulated to the *amount* each spent in performing its respective portion of the work. They did not, however, stipulate that those amounts were reasonable or necessary. Plaintiff does not contend that the stipulation extended farther than the states claims but argues that the instruction informed the jury of only the upper limits on plaintiff's damages. We believe that the instruction could be understood as telling the jury what it must find as the amount of plaintiff's damage. Such a suggestion obviously should be avoided on retrial.

Reversed and remanded.