Argued and submitted May 4, 1984, at Pendleton, Oregon, resubmitted In Banc February 6, affirmed on appeal and cross-appeal November 14, 1985, Northwest Pipeline's reconsideration and Banister Continental's reconsideration denied January 10, Banister Continental's petition for review denied April 29 (301 Or 76), Northwest Pipeline's petition for review allowed April 29, 1986 (301 Or 76)
See later issue Oregon Reports

# BANISTER CONTINENTAL CORPORATION,
*Respondent - Cross-Appellant,*

*v.*

# NORTHWEST PIPELINE CORPORATION,
*Appellant - Cross-Respondent.*

## (81-6-745; CA A28212)

709 P2d 1103

In Banc

Elizabeth T. Dunning, Salt Lake City, Utah, and James H. Clarke, Portland, argued the cause for appellant - cross-respondent. With them on the briefs were Watkiss & Campbell, Salt Lake City, Utah, and Corey, Byler & Rew, Pendleton, and Spears, Lubersky, Campbell, Bledsoe, Anderson & Young, Portland.

Arden E. Shenker, Portland, and Robert T. Mautz, Pendleton, argued the cause for respondent - cross-appellant. With them on the briefs were Lamar Tooze, Elizabeth A. Trainor and Tooze Kerr Marshall & Shenker, Portland, and Mautz, Hallman & Teicher, Pendleton.

GILLETTE, J.

Buttler, J., concurring in part and dissenting in part.

## GILLETTE, J.

This is an action for damages for breach of two construction contracts. Defendant appeals from a judgment entered after a jury verdict in plaintiff's favor; plaintiff cross-appeals, seeking additional prejudgment interest. We affirm.

A detailed discussion of the facts is not required. In 1980, plaintiff and defendant entered into two contracts under which plaintiff would build 112 miles of natural gas pipeline for defendant in eastern Oregon. Work began in September 1980, and was completed in October 1981. Virtually every fact concerning that period is in dispute. It is sufficient to say that the parties had a falling out, resulting in this lawsuit.

Plaintiff's complaint alleged 25 contract breaches, which defendant denied; defendant also offered several affirmative defenses. The trial lasted three months. The jury returned a verdict, including special written findings of fact, finding for plaintiff on 19 allegations of contract breach; defendant's affirmative defenses were rejected. The jury also awarded plaintiff over $11,000,000 in damages and over $4,000,000 in prejudgment interest. After being instructed to recalculate the prejudgment interest, the jury reduced that award to approximately $800,000. The trial court then accepted the verdict and entered judgment. This appeal followed.

Although defendant raises 54 assignments of error, only a few require discussion. The parties disputed the meaning of several portions of the two contracts. Defendant's first assignment is that the trial court should have interpreted the two contracts in issue as a matter of law and should have decided which, if any, of the contract provisions were ambiguous; the second assignment is that the trial court should not have instructed the jury to construe any ambiguities in the contracts against defendant. We disagree.

The trial court instructed the jury:

"A contract results when an offer made by one party is accepted by the other. Until there has been an acceptance, there is no contract. And until there has been acceptance, the party making the offer has the right to withdraw its offer. In this case Banister made an offer to perform the specified work for a specified price. Banister had a right to withdraw its offer

at any time prior to its acceptance and signing by Northwest. However, once Banister's offer was accepted and signed by Northwest, then there was a valid and binding contract between the parties.

"It is the policy of the law to protect the dignity of contracts and recognize that parties have the freedom to make their own terms in a contract. The parties to an agreement have a right to rely upon and to expect the performance of the terms of that agreement by the other party. That is, each party has a duty or obligation to the other party to perform the promises made and each party also acquires a right to the performance that is promised by the other party.

"The contracts between Northwest and Banister created obligations to perform the promises set forth in the contracts. Both Northwest and Banister promised, agreed and undertook to perform their respective obligations as set forth in the contracts and both Northwest and Banister had the right to expect the reasonable performance of the promises and agreements made by the other.

"Accordingly, you must look to the contracts and any agreed upon modifications or amendments thereto to determine if Northwest materially breached any of the terms.

"The contract between the plaintiff and the defendant should be interpreted in accordance with the terms of those contract documents and in accordance with the intention of the parties who executed the contract, pursuant to the evidence in this case. You should take the contract documents as a whole. If you find inconsistent provisions in the contracts, you may consider the evidence, the circumstances surrounding the execution of the contract, and the transactions between the parties to determine the meaning of the agreements between the parties here. Because [the] contract documents between the plaintiff and the defendant were primarily drafted and prepared by the defendant, the contract documents must be construed against the defendant wherever there are any ambiguities in the contract provisions."

The respective functions of the court and jury regarding the construction of contracts are clear. As a general rule, the construction of a contract is a question of law to be decided by the court. If the contract provisions are unambiguous, it is the court's duty to construe the contract and declare its legal effect to the jury. *Timberline Equip. v. St. Paul Fire and Mar. Ins.*, 281 Or 639, 643, 576 P2d 1244 (1978); *Sunset Coatings Co., Inc. v. Dept. of Trans.*, 62 Or App 53, 56, 660 P2d 164, *rev*

*den* 294 Or 792 (1983). Only if provisions of a contract are ambiguous does its meaning become a question of fact for the jury to decide. *Meskimen v. Larry Angell Salvage Co.,* 286 Or 87, 92-93, 592 P2d 1014 (1979); *Bartlam v. Tikka,* 50 Or App 217, 220, 622 P2d 1133, *rev den* 290 Or 853 (1981). However, before submitting the question to the jury, the court must first determine, as a matter of law, that a contract provision is ambiguous. *Evenson Masonry, Inc. v. Eldred,* 273 Or 770, 772, 543 P2d 663 (1975); *Sunset Coatings Co., Inv. v. Dept. of Trans., supra,* 62 Or App at 56.

■ Here, about the only thing the parties seemed to agree on was that the contract was ambiguous. The record in this three month trial is replete with efforts by both sides to establish that their version of the meaning of the parties' agreement was the correct one. Counsels' closing arguments reflect the same thing. Under these circumstances, and although the better course might still have been to sort laboriously through the extensive contract documents and separate for the jury's consideration the clear from the ambiguous, we cannot say that the course followed was wrong. The very size of the task defendant claims the trial court should have undertaken would, in all likelihood, have led to instructions so long, meticulous and exhausting in detail that no jury could have emerged from them clear-headed. There was no error.

Defendant also contends that the trial court erred in instructing the jury that any ambiguous contract provisions must be construed against it, because it drafted the contracts. Defendant relies on *Weber v. Kamyr, Inc.,* 269 Or 617, 525 P2d 1307 (1974). In *Weber,* the plaintiff assigned as error the failure of the trial court to give a jury instruction that required the jury " 'to construe the contract most strongly against the party who prepared the documents.' " 269 Or at 631. In affirming the trial court's refusal to give the requested instruction, the court held:

> "It is our conclusion that the trial court was correct in refusing to give the instruction because it was not appropriate to the determination which the jury had to make. Plaintiff correctly contends that it is the rule in Oregon that ambiguities in a contract are normally to be resolved against the scrivener. However, plaintiff fails to differentiate between rules of interpretation for the court and those instructions

which serve as guides for the jury. Theoretically, juries do not construe contracts. They decide facts. Courts construe contracts by giving legal effect to such findings of fact. It is proper for courts to instruct juries as to alternate constructions which would apply, depending on the possible outcome of their factual deliberations. Appropriate to the occasion is the following statement from 53 Am Jur 229, Trial § 270:

> " '* * * The rule laid down in cases which consciously regard the lines that separate the function of the court from that of the jury is substantially that the construction of the contract is always a matter of law for the court no matter how ambiguous or uncertain or difficult its terms, and the jury can only assist in determining disputed questions of fact; that if the circumstances to be considered in the interpretation of the contract are in dispute and the meaning of the contract depends thereon, the determining of the disputed facts must be left to the jury, but the proper construction of the contract cannot be left to them.' (Footnote omitted.)

> "The requested instruction is one which courts use in the interpretation of contracts and one which courts take into consideration when instructing the jury as to what results to reach depending on how the jury decides the facts; *however, the rule is not a proper subject of an instruction to a jury.*" 269 Or at 631. (Emphasis supplied.)

Plaintiff, for its part, relies on a number of cases, decided after *Weber,* which hold that ambiguous contracts are to be construed against the drafter. *See, e.g., Meskimen v. Larry Angell Salvage Company, supra,* 286 Or at 93; *Russell v. Sealed Power Corp.,* 278 Or 243, 247, 563 P2d 712 (1977); *Busto v. Manufacturers Life Ins. Co.,* 276 Or 707, 713, 556 P2d 96 (1976); *Taylors Coffee Shop v. Taylor,* 56 Or App 419, 422, 643 P2d 347, *rev den* 293 Or 235 (1982). However, none of those cases approved an instruction requiring the *jury* to construe a contract against the drafter.

■ The issue defendant now urges was not, in our view, properly preserved. That is, we cannot say that the argument defendant now articulates so well was presented with equal— or even sufficient—clarity to the trial court.

The court instructed the jury as follows:

> "The contract between the plaintiff and the defendant should be interpreted in accordance with the terms of those

contract documents and in accordance with the intention of the parties who executed the contract, pursuant to the evidence in this case. You should take the contract documents as a whole. If you find inconsistent provisions in the contracts, you may consider the evidence, the circumstances surrounding the execution of the contract, and the transactions between the parties to determine the meaning of the agreements between the parties here. Because the contract documents between the plaintiff and the defendant were primarily drafted and prepared by the defendant, the contract documents must be construed against the defendant wherever there are any ambiguities in the contract provisions."

Defendant then took the following exception:

"And in that respect, the defendant takes exception to the court's failure to instruct the jury on the meaning and interpretation and legal effect of the contract as we believe the law requires the court to do.

"Furthermore, with respect to that, without the instruction by the court as to the meaning and legal effect of the contract, the jury is left with a very complex document that I think would be very difficult and time consuming for them to fully understand. I think they need the guidence [sic] and legal interpretation of the court.

*"But it becomes even more complex because the court has given the jury an instruction on ambiguity* and on the contract *and told the jury that if they find anything in the contract that is—that they find confusing or ambiguous, that then they are to resolve that against Northwest.*

*"It is our exception to the court's instruction to the effect that the court should have interpreted the contract* and the court then should have isolated those sections in the contract in which the court felt there was an ambiguity and then instructed the jury on how to deal with that ambiguity.

*"The court has not done this. Instead the court has given only a general instruction on ambiguities, leaving the jurors to determine whether or not an ambiguity exists and then leaving them without proper guidance as to the resolution of that ambiguity.*

"And we take exception to that entire matter because we think it has prevented the jury from considering the essential defense of the defendant in this case." (Emphasis supplied.)

We think the references in the objection to the court's instruction on construing ambiguities against the

drafter was intended to illustrate defendant's dissatisfaction with the court's failure to inform the jury, paragraph by paragraph, as to which contract provisions were ambiguous; they were not a separately articulated objection to the instruction's contents, *per se.* It follows that defendant's assignment of error fails. Because, however, the parties are certain to seek Supreme Court review of our decision in this case, a further discussion of *Weber* appears to us to be warranted.

■　　　As we perceive it, the construction of ambiguous contracts is a three-part process, requiring (1) a determination that the contract (or a portion of it) is ambiguous; (2) resolution of the parties' intent as to the ambiguous portion by evidence, if such a resolution is possible; and (3) *if resolution is impossible,* resort to the maxim of construction against the drafter, in order to resolve the issue. So viewed, the maxim's role in resolution of the parties' dispute is a limited one. Even assuming—as we shall discuss more fully—that *Weber* does not constitute a blanket prohibition of the maxim's use by juries, any instruction should clearly delineate the step-by-step process involved and reserve the maxim's availability until the final step.

　　　This brings us to *Weber.* The court's language in that case, which is very specific, is set forth at page 5, *supra.* We understand that passage from *Weber* to recognize our tripartite view of the process, but to reserve use of the maxim to the court, not the jury, because the maxim is a legal rule, not a piece of evidence. The question this in turn gives rise to is a simple one: Why can a jury not be appropriately instructed as to that legal rule? It would not be wrong, we think, to tell a jury, in essence,

> "You are the judges of the facts. The issue here is the intent of the parties to this ambiguous contract. You are to determine that intent from the evidence that has been received in this case. However, if, after fairly considering all of the evidence, you find that you cannot resolve the ambiguity, then you are to resolve the ambiguity against the party who wrote the contract."

■　　　In *Weber,* the proposed instruction mixed the legal concept into the fact-finding process, essentially turning the maxim into a piece of evidence to be weighed at the fact-finding stage. The instruction given in our case suffers from

the same vice, *although there was no objection to it on that basis.* Whatever the failings of these two individual instructions, however, there is no reason to keep any useful tool of analysis—like the legal maxim we consider today—from a properly instructed jury. We do not think *Weber* should be viewed as precluding any instruction which carefully preserves the step-by-step analysis that the law requires.

For the foregoing reason, as well as the procedural one alluded to earlier, defendant's argument on the instruction is not, in our view, well taken.

Under assignments of error 51 to 54, defendant argues that the trial court erred in failing to compel discovery of five Banister "diaries."[1] After defendant had requested the diaries and plaintiff had objected, the trial court conducted an *in camera* inspection of the diaries.[2] Afterward, the trial court released those portions which appeared to it to be discoverable. During the trial, Roger Banister testified that he had reviewed his diary before testifying. Pursuant to OEC 612,[3] defendant again requested production of the diaries. The trial court refused to order any further production.

ORCP 43 governs the production of documents. Under ORCP 43A, a party may serve a request on any other

---

[1] Defendant sought Harold Banister's 1980 and 1981 diaries, Rodger T. Banister's 1980 and 1981 diaries and Ronald K. Banister's 1981 diary. The Banisters are principals of plaintiff.

[2] One of these assignments of error is not well taken. That assignment contends that the trial court failed to review the diaries before trial. The record clearly reflects that the trial court did review them.

[3] OEC 612 provides:

"If a witness uses a writing to refresh memory for the purpose of testifying, either while testifying or before testifying if the court in its discretion determines it is necessary in the interests of justice, an adverse party is entitled to have the writing produced at the hearing, to inspect it, to cross-examine the witness thereon, and to introduce into evidence those portions which relate to the testimony of the witness. If it is claimed that the writing contains matters not related to the subject matter of the testimony, the court shall examine the writing in camera, excise any portions not so related, and order delivery of the remainder to the party entitled thereto. Any portion withheld over objections shall be preserved and made available to the appellate court in the event of an appeal. If a writing is not produced or delivered pursuant to order under this section, the court shall make any order justice requires, except that in criminal cases when the prosecution elects not to comply the order shall be one striking the testimony or, if the court in its discretion determines that the interests of justice so require, declaring a mistrial."

party requiring that party to produce any designated document that "contains matters within the scope of Rule 36B." ORCP 36B(1) defines the scope of discovery. A party "may inquire regarding any matter, not privileged, which is relevant to the claim or defense" of any party.[4] The document need not be admissible itself, so long as the document "appears reasonably calculated to lead to the discovery of admissible evidence." ORCP 36B(1).

To the extent that the diaries, or portions thereof, are relevant and not privileged, defendant is entitled to inspect and copy them on a proper request pursuant to ORCP 43A. To the extent that the diaries, or portions thereof, are either not relevant or are privileged, defendant is not entitled to inspect or copy them. Once defendant had requested the production of the diaries, plaintiff was required to convince the trial court that the diaries, or portions thereof, were exempt from discovery. The trial court's decision not to order plaintiff to produce the entire contents of all the diaries can only be disturbed if we find that it abused its discretion, which it did not in this case.

We also hold that the rule regarding discovery of documents used to refresh a witness' memory is not an absolute. If a witness testifies that he used a writing to refresh his memory, either before or while testifying, then OEC 612 requires the trial court again to exercise its discretion to determine whether the discovery of the writing is required in the interest of justice. Here the trial court exercised its discretion when it decided that no further discovery was required. Such broad discretion is necessary because of the myriad situations which face a trial court. In the absence of an abuse of discretion, we will uphold the trial court. There was no abuse of discretion here when the trial court ordered the production of portions of the diaries while not compelling plaintiff to produce other portions.[5]

The final issue requiring discussion is prejudgment

---

[4] OEC 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

[5] Many entries in the diaries lack relevance. Had we been the trial court, we might well have exercised our discretion differently, but we do not review *de novo*, and we will not substitute our judgment for the trial court's when the court's ruling lay within the range of its discretion, as it did here.

interest. Initially, plaintiff did not request any prejudgment interest. Shortly before trial, plaintiff amended its second amended complaint and asserted a claim for prejudgment interest; it also filed exhibits computing the amount of damages allegedly due. At the close of the evidence, the trial court ruled that, as a matter of law, plaintiff could not recover any prejudgment interest, because neither the amount of damages nor the date on which they were due was ascertainable. On reconsideration, the trial court submitted the issue of prejudgment interest to the jury. There were four separate elements of damage on which the jury was told it could award prejudgment interest. As to three of the four, entitlement to interest was clear. As to the fourth, involving a number of different concerns, the problem is more difficult. The trial court concluded that these damages were ascertainable as of May 3, 1982, when plaintiff submitted exhibits to defendant that quantified its claims in this regard. The jury was instructed to award interest, at the legal rate, on any damages it found from May 3, 1982, or any later date when the amount of damage was ascertainable. The jury awarded damages of $11,167,734.11 and $4,637,132.60 in prejudgment interest. The trial court instructed the jury to recalculate the interest, and it returned a verdict of $790,308.33. Under assignments of error 49 and 50, defendant contends that plaintiff is not entitled to any prejudgment interest. Plaintiff cross-appeals, contending that the original award was proper and should be reinstated.

■ The rule on prejudgment interest is clear, even if its application is not. Prejudgment interest may be awarded on unliquidated damages for breach of contract when the damages are either ascertained or readily ascertainable and if the date from which prejudgment interest runs is also easily ascertained. *Kreig v. Union Pacific Land Res. Corp.* 269 Or 221, 234-35, 525 P2d 48 (1974); *Public Market Co. v. Portland,* 171 Or 522, 625, 130 P2d 624, 138 P2d 916 (1943). Application of the rule is difficult, because the cases purportedly applying it are not consistent. One line holds that, even though damages were not ascertainable until issues of fact have been resolved, prejudgment interest is still proper. *See Isler v. Shuck,* 38 Or App 233, 239-40, 589 P2d 1180 (1979); *see also Employers' Fire Ins. v. Love It Ice Cream,* 64 Or App 784, 670 P2d 160 (1983); *Walter E. Heller Western, Inc. v. Bohemia,*

*Inc.,* 61 Or App 57, 655 P2d 1073 (1982); *Sch. Dist. No. 1 v. Mission Ins Co.,* 58 Or App 692, 650 P2d 929 (1982), *rev den* 294 Or 682 (1983); *McKean v. Bernard,* 54 Or App 540, 635 P2d 673 (1981); *Carlson v. Blumenstein,* 54 Or App 381, 635 P2d 380 (1981), *mod on other grounds,* 293 Or 494, 651 P2d 710 (1982); *Laro Lumber Company v. Patrick,* 52 Or App 1035, 630 P2d 400 (1981). The second line holds that damages are not ascertainable where there are conflicting claims regarding the amount in dispute; thus, no prejudgment interest is allowed. *Arden-Mayfair v. Patterson,* 46 Or App 849, 613 P2d 1062, *rev den,* 290 Or 149 (1980); *see also Dale's Sand & Gravel v. Westwood Construction,* 62 Or App 570, 661 P2d 1378, *rev den* 295 Or 259 (1983); *Cloud v. Riddell,* 54 Or App 917, 636 P2d 996 (1981), *rev den,* 292 Or 581 (1982); *SDS Lumber Co. v. Allendale Mut. Ins. Co.,* 563 F Supp 608 (D Or 1983).[6]

As already noted—and as the dissent demonstrates in greater detail—prejudgment interest on most of the elements of plaintiffs' damages was clearly appropriate. As to the remainder, the present record supports the trial court's conclusion that plaintiff's damages were ascertainable as of May 3, 1982, when it submitted exhibits to defendant which quantified its claim. The exhibits carefully document the total amount of plaintiff's alleged damages as well as how those damages were calculated. The facts that defendant disputed any liability and that the jury did not award plaintiff all the damages that it sought are insufficient grounds to deny prejudgment interest. Although, as the dissent demonstrates, the question is not altogether free from doubt, this case fits within the first line of cases cited above and we follow them. The trial court did not err in allowing the jury to award prejudgment interest after May 3, 1982.[7]

We have considered assignments of error 3 through 48 and find that they do not require discussion.

Affirmed on appeal and cross-appeal.

---

[6] We need not reconcile these cases in this opinion.

[7] We necessarily reject plaintiff's cross-appeal, which sought to reinstate the original jury award of $4,637,132.60 in prejudgment interest. The jury was instructed that it could award prejudgment interest after May 3, 1982. The jury returned its verdict on February 13, 1983. The legal rate of interest is nine percent. ORS 82.010(2). We do not know how the jury arrived at the figure, but its initital award was properly rejected.

**BUTTLER, J.,** concurring in part; dissenting in part.

I concur with all of the issues resolved by the majority, except the affirmance of prejudgment interest. On that point, although I agree with the majority's statement that the cases do not appear to be consistent, I am not as certain as the majority appears to be that the rule on the subject is clear. Because I view the rule as being less than clear, both as enunciated by the Supreme Court and as applied by this court and the trial courts, and do not think prejudgment interest should be allowed here, I dissent. Not only is the rule murky, but the Supreme Court has not, to my knowledge, articulated any policy considerations behind whatever the rule is to aid in its application.

One of the earliest statements of the rule is found in *Baker County v. Huntington,* 48 Or 593, 603, 87 P 1036, 89 P 144 (1906):

> "When the right to recover in an action is in good faith denied, interest will not be allowed on the demand prior to its liquidation by judgment * * *."

That statement of the rule tells me that if either liability or the amount demanded is contested in good faith, prejudgment interest is not allowable. That case has not been overruled; it was cited as recently as *City of Portland v. Hoffman Const. Co.,* 286 Or 789, 596 P2d 1305 (1979), a *quantum meruit* case, which distinguished *Baker County* on the ground that it was not a *quantum meruit* case. One might reasonably conclude from that treatment of *Baker County* that it remains good law in other than *quantum meruit* cases.

In *Public Market Co. v. Portland,* 171 Or 522, 130 P2d 624, 138 P2d 916 (1943), it was argued that the fact that the damages were unliquidated necessarily barred prejudgment interest. The court, quoting from 1 Sedg. on Damages 571, § 300 (9th ed), said that the distinction between liquidated and unliquidated damages is disregarded where

> " 'the demand is of such a nature that its exact pecuniary amount was either *ascertained,* or *ascertainable* by simple computation, or by reference to generally recognized standards such as market price,' and where 'the time from which interest, if allowed, must run,—that is, a time of definite

default or tort feasance,—can be ascertained.' " 171 Or at 625. (Emphasis in original.)

That rule was restated in *Krieg v. Union Pacific Land Res. Corp.,* 269 Or 221, 234, 525 P2d 48 (1974), with only slight modification: The words "ascertainable by simple computation" in *Public Market* were changed to "readily ascertainable."

It seems clear that, at least in *quantum meruit* cases, the *Baker County* exception to the allowance to prejudgment interest based on a good faith denial of a demand for payment is not, if it ever was, the law. The rationale appears to be that the amount of a *quantum meruit* claim is readily ascertainable in the market place by determining the reasonable value of the labor and materials and, in some instances, a reasonable profit. *City of Portland v. Hoffman Const. Co., supra.*

This court has generally allowed prejudgment interest in *quantum meruit* cases: *Carlson v. Blumenstein,* 54 Or App 380, 635 P2d 380 (1981), *mod on other grounds* 293 Or 494 (1982); *Laro Lumber Company v. Patrick,* 52 Or App 1035, 630 P2d 400 (1981). However, in at least two *quantum meruit* cases, we reversed awards of prejudgment interest. In *Dale's Sand & Gravel v. Westwood Construction* 62 Or App 570, 576, 661 P2d 1378, *rev den* 295 Or 259 (1983), we stated:

"* * * Dale's own brief provides ample evidence that the unit value assigned to the compaction work and the manner of calculating total value of the work were not matters of simple computation for the trial court."

We did, however, affirm the award of prejudgment interest on the amount determined to have been owed for the delivery of rock, because it was readily ascertainable. In *Cloud v. Riddell,* 54 Or App 917, 636 P2d 996 (1981), *rev den* 292 Or 581 (1982), we reversed an award of prejudgment interest on the defendant's counterclaim for lost profits resulting from delay in completion of the work. We note that the plaintiff had offered evidence that they had never expressly agreed to the extra work performed by the contractor and that some of the work was not properly performed, requiring a setoff. If there is a distinction between the two groups of cases, it has not been articulated. There is a suggestion that the damages must be ascertainable by *simple* computation, *Dale's Sand & Gravel, supra,* and also a suggestion that a good faith dispute defeats

entitlement to prejudgment interest (shades of *Baker County*). *Cloud v. Riddell, supra.*

In cases that did not involve quantum meruit *claims,* we have been equally inconsistent. In *McKean v. Bernard,* 54 Or App 540, 635 P2d 673 (1981), and *Isler v. Shuck,* 38 Or App 233, 589 P2d 1180 (1979), there were questions of fact that had to be resolved before the amount of liability could be determined; in each case, we held prejudgment interest was allowable. On the other hand, in *Arden-Mayfair v. Patterson,* 46 Or App 849, 857, 613 P2d 1062, *rev den* 290 Or 149 (1980), we reversed an award of prejudgment interest, stating:

> "Given the conflicting claims of the parties, it can hardly be said that the exact pecuniary amount owed by plaintiff was easily ascertained, or ascertainable, by simple computation. A review of the evidence clearly shows that the parties did not agree upon the amount in dispute. In *Catlin v. Knott,* 2 Or 321 (1868), the Supreme Court addressed the same issue * * * [and said] 'It is very evident there was no mutual understanding as to any certain amount of difference between them.' "

It appears to me that none of the cases has attempted to put "the rule" together; we can pick and choose—throw darts at a dart board: deny prejudgment interest if the computation of damages is complicated, or there is a good faith dispute, or if the parties did not agree on the amount in dispute or, generally, it strikes us that it should be denied. On the other hand, we may allow it when, somehow at some time, the plaintiff is able to come up with a definite figure, or the defendant acted in bad faith or, generally, we think it is appropriate.

In an effort to find an anchor, I would be inclined to accept the statement from *Arden-Mayfair v. Patterson, supra,* as the most complete one, consistent with the opinions of the Supreme Court in *Public Market Co. v. Portland, supra,* and *Krieg v. Union Pacific Land Res. Corp., supra.* If I am correct in that, the initial question is whether in this case the various amounts claimed by plaintiff were "easily ascertained, or ascertainable, by simple computation." It is not clear from the majority opinion exactly what plaintiff's prejudgment interest claims are based on. The trial court's instructions indicate the various categories the jury was told to consider:

> "Under the facts, the law of this case, interest, if any, is a

matter that must be determined by the jury. Accordingly, you may include in your determination of the amount that is due Banister, if anything, interest as herein provided.

"First, the contract required Banister to pay invoices within 20 days after receipt subject to Northwest's right to retain ten percent of all invoices pending receipt of their completion affidavit signed by the contractor's representative. With respect to any untimely payment of a Banister's invoice, you must calculate the number of days for which any specific amount of money was late and you must then apply the legal rate of interest at nine percent per annum thereto which will yield the amount of that interest to which Banister is entitled.

"Second, if you find Banister has submitted invoices to Northwest which Northwest improperly refused to pay, then with respect to those invoices you must calculate the number of days for which any specific amount of money was late and you must then apply the legal rate of interest at nine percent per annum thereto, which would yield the amount of that interest to which Banister is entitled.

"Third, with respect to the retainage, Northwest had the right to retain ten percent of all invoices pending receipt of proper invoices and of an executed contractor completion affidavit on forms furnished by the company, certifying that all bills for labor and material had been paid. If you find that Northwest improperly refused to release all or part of the retention, then you must calculate the number of days for which any specific amount of retainage was late in being released. And you must then apply the legal rate of interest at nine percent per annum thereto, which will yield the amount of that interest to which Banister is entitled.

"Fourth, with respect to the damage claim of Banister, if you determine that any damages have been suffered by Banister as a result of the material breaches of the contract by Northwest, as of any specific date on or after May 3rd, 1982, for any such specific amount of damage, you must apply the legal rate of interest of nine percent per annum thereto, from and after the date, not earlier than May 3rd, 1982, a specific amount of damage was ascertainable which will yield the amount of that interest to which Banister is entitled.

"The interest on any such award would begin to run at the time any such principal item was certain enough in value to be reasonably quantified if at or before that time the claim had been presented to the defendant and rejected. In order to make this award of interest, you must determine the date or

dates upon which the plaintiff's particular claims for which you make an award were reasonably calculable and were rejected by the defendant. You are entitled to compensate the plaintiff from such dates for interest at the rate of nine percent per annum."

The first category of claims outlined by the instructions is no problem, because, in my view, it does not constitute prejudgment interest. Because the contract required Banister to pay invoices within 20 days after receipt, the instruction simply requires the jury to determine the number of days for which any specific amount of money was paid late and to award interest on that specific amount for that number of days. That part of the interest is part of Banister's claim under the contract, not prejudgment interest.

The second category involves invoices that were submitted but improperly rejected by Northwest. In that category, the amount is ascertained and the date the payment is due is also ascertained. Those claims fall squarely within the rule allowing prejudgment interest.

The third category relates to the amount of the 10 percent retainage that Northwest improperly withheld. The jury was instructed that, if Northwest had improperly refused to release all or part of the retention, then Banister was entitled to interest on the amounts improperly retained for the number of days during which it was withheld. Again, the amount is definite and the date on which the payment was due is definite.

It is the fourth category that creates problems. The case was submitted to the jury on a special verdict containing numerous interrogatories, the last two of which related to fixing the amount of damages. There were two categories of claims: The first category related to losses claimed in plaintiff's Exhibit B-128, for which there was to be no prejudgment interest. The total damages asserted in Exhibit B-128 was $3,517,834. The jury awarded $884,619.94. The second category related to damages arising from all other losses and matters "proved herein as damages," for which plaintiff's final claim appears to have been $26,383,734. The jury awarded $11,167,734.11, plus prejudgment interest of $4,637,132.60 (which was later substantially reduced). Because the prejudgment interest on all four categories was awarded in a lump

sum, we do not know how much was attributed to the fourth category.[1]

The lawsuit was filed in June, 1981, and it was not until May 3, 1982, that plaintiff set forth with any specificity the amount of damages it was claiming, and the numerous bases for those damages. Although the trial court initially ruled that prejudgment interest was not allowable, it finally concluded that plaintiff's damages were readily ascertainable as of May 3, 1982, and therefore prejudgment interest should be allowed from no earlier than that date. It appears, however, that even after the May 3, 1982, schedules were submitted, plaintiff amended the amounts several times, including such things as lost profits and loss of productivity, using different accounting techniques.

Clearly, plaintiff's damages had not been ascertained; I find it extremely difficult to say that its damages were readily ascertainable; they were certainly not ascertainable by simple computation. It is also clear that the parties were not in agreement on the amount in dispute. Whether prejudgment interest *ought* to be allowed in a given case must depend, in part at least, on the policy behind the rule allowing it. So far, I do not believe that the Supreme Court or this court has articulated what that policy is, other than to relate it to the statute providing for interest on "all moneys after they become due." ORS 82.010(2). Presumably, the allowance of prejudgment interest in certain kinds of cases would encourage settlements, a laudable goal. However, if the defendant has no reasonably ascertainable figure to offer, on a rational basis, that reason would not appear to be applicable here. Another reason for allowing prejudgment interest is to make the plaintiff whole, the assumption being that readily ascertainable amounts were due on a readily ascertained date. That reason does not appear to be applicable here, either. If the defendant could not avoid paying interest by paying or offering to pay a definite amount on or as of a certain date, why should plaintiff be entitled to it after a jury verdict has

---

[1]Defendant objected to the giving of that instruction for reasons which it had argued to the court earlier. During the earlier arguments, each of the four categories of prejudgment interest claims was argued, and defendant objected to each of them. Defendant also moved at the close of the evidence for a directed verdict "on the issue of interest and prejudgment interest" on the grounds that, as a matter of law, it was not appropriate and that it was not for the jury to decide.

reduced the amount to which plaintiff is entitled to an amount that bears no discernable relationship to the amounts claimed?

Because I would reverse the judgment for prejudgment interest, I dissent from that part of the opinion affirming it.